**GALA ENTERPRISES, INC., Plaintiff,**

v.

**HEWLETT PACKARD COMPANY, Defendant.**

**HEWLETT PACKARD COMPANY, Counterclaim–Plaintiff,**

v.

**GALA ENTERPRISES, INC. and Al Mascolo, Counterclaim– Defendants.**

**No. 96 Civ. 4864(DC).**

United States District Court, S.D. New York.

Jan. 9, 1998.

Fischbein, Badillo, Wagner, Harding by Harold J. Ruvoldt, Jr., New York City, for plaintiff Gala Enterprises, Inc.

Kavanagh Maloney & Osnato LLP by Ronald G. Blum, New York City, Stevens &

O'Connell, by George L. O'Connell, Sacramento, CA, for defendant Hewlett Packard Co..

LaRossa, Mitchell & Ross by Michael S. Ross, Peter Sherman, New York City, for Fischbein, Badillo, Wagner, Harding.

## MEMORANDUM DECISION

CHIN, District Judge.

Hewlett Packard Company ("Hewlett Packard") seeks an order holding that a $500,000 fee paid by Gala Enterprises, Inc. ("Gala") to the law firm Fischbein ● Badillo ● Wagner ● Harding (the "Firm") was a fraudulent conveyance subject to attachment in this case. On May 28, 1997, after reviewing the parties' initial submissions, I determined that an evidentiary hearing was necessary because certain facts were unclear, including: who had actually paid the fee; for whom services were to be provided; whether $500,000 was fair consideration for the services contemplated; whether an additional advance payment of $270,000 for disbursements was reasonable; whether it made sense for the clients to retain to represent them in criminal proceedings in California a New York law firm that did not have a reputation for doing criminal defense work; whether the transfer of $770,000 to the Firm rendered Gala insolvent; and whether the transfer of those funds constituted a fraudulent conveyance. See Gala Enters. v. Hewlett Packard Co., 970 F.Supp. 212 (S.D.N.Y.1997).

I conducted an evidentiary hearing on July 15 and 21, 1997. The Firm and Hewlett Packard submitted letter briefs thereafter. Having heard the evidence presented at the hearing and having considered each side's arguments, I conclude that the payment of the $500,000 fee to the Firm did not constitute a fraudulent conveyance. Accordingly, Hewlett Packard's request for an order holding the fee subject to attachment is denied.

The following constitute my findings of fact and conclusions of law.

## THE FACTS

From the fall of 1995 through the spring of 1996, Gala sold computer parts to Hewlett Packard. These purchases were negotiated by Jason Turner, an employee of Hewlett Packard. In return for certain alleged kickbacks from Gala and its principals, Turner arranged for Hewlett Packard to pay Gala for parts that were grossly overpriced or never delivered at all. Between November 1995 and April 1996, Hewlett Packard paid some $2.1 million to Gala and it alleges in this lawsuit that it is entitled to a return of all or a substantial part of that money. Gala alleges that Hewlett Packard still owes it some $287,000.

On April 8, 1996, Turner was arrested in California and charged with grand larceny for his involvement in these transactions. Abbott Solomon and Albert Mascolo, the officers and sole shareholders of Gala, and Gala itself were implicated.

On April 9, 1996, Solomon called Bruce Lederman at the Firm for legal assistance. Solomon turned to Lederman because Lederman had been friends with the Solomon family for some 25 years.[1] Lederman was a litigator, but he did not have much experience in criminal law. Lederman called on his partner, Harold Ruvoldt, Jr., who did have substantial experience in criminal law, both as a prosecutor and as a defense lawyer. Ruvoldt joined the Firm in July 1995 precisely for the purpose of helping the Firm develop a white-collar criminal defense practice.[2]

On April 9 and 10, 1996, members of the Firm had several internal discussions about taking on the matter and whether to charge a "flat fee" or bill on an "hourly" basis. Members of the firm also met with Solomon and Mascolo. On April 9 or 10, 1996, in

---

1. Lederman described the relationship as follows:

   I know Abbott Solomon for about 25 years. His brother, Lawrence, or Larry, is my best friend in the world. I know his parents, Laura and Martin, for about 25 years, and I've known Abbott socially for about 25 years.

   (Tr. 282).

2. The Firm's expert witness, Frederick P. Hafetz, a former President of the New York Council of Defense Lawyers, and Lederman acknowledged at the hearing that the Firm did not previously have a reputation for doing criminal defense work. (Tr. 114, 317).

discussions as to the resources available to Gala, Solomon, and Mascolo for attorneys' fees, Lederman learned that Gala had approximately $1.3 million in banking accounts. He did not ask Solomon and Mascolo what the source of those funds was, nor did they volunteer the information.

According to Ruvoldt and Lederman, Solomon and Mascolo were adamant about wanting a flat fee arrangement.[3] There was some disagreement within the Firm in this respect. Lederman initially believed that a fixed fee of only some $350,000 to $400,000 would be sufficient. Lederman was comfortable with a flat fee arrangement, as the Firm had previously undertaken some civil matters on a flat fee basis. In addition, in his opinion there were certain advantages to flat fee arrangements:

> [K]nowing what it is going to cost up front, if I can't manage the case better, then it becomes partly my fault. If the fee is decided up front, it is paid up front, you don't have to worry about clients being unhappy [that] the bill is too high, you don't have to chase them, the money is in the house....

(Tr. 317; *see also* Tr. 19).[4] Eventually, a $500,000 flat fee was proposed.

Ruvoldt preferred an hourly arrangement. He believed the proposal of a $500,000 flat fee was insufficient to cover the time that would be required to litigate a criminal case in California as well as an eventual civil suit. He felt that $600,000 or $650,000 or more was necessary. Although he believed that $500,000 was insufficient to cover the amount of time that would be required, he eventually acquiesced because of the "deep personal relationship" between Lederman and Solomon. In addition, the case was an "interesting" one and the Firm was trying to develop a white-collar practice. (Tr. 171). Indeed,

Ruvoldt viewed the case "almost like a los[s] leader." (*Id.*).

Ruvoldt spoke with Solomon and Mascolo at the time, both separately and together, about the merits as well. Lederman also participated in some or all of these conversations. Both Solomon and Mascolo "vehemently denied" having committed any crimes and both denied any involvement in any kickback scheme. (Tr. 285; *see* Tr. 150, 154).

It was apparent to Ruvoldt and perhaps others that a potential conflict existed as to the Firm's representation of both Solomon and Mascolo. Although Solomon and Mascolo agreed that the Firm should represent both initially, they and the Firm understood that in all likelihood separate counsel would eventually have to be obtained for Mascolo. Solomon, Mascolo, and the Firm further understood that in the event separate counsel were to be required, the fees for separate counsel would have to be paid for separately.

In the end, the Firm agreed to take the matter on for a flat fee of $500,000, not including costs and disbursements. Solomon and Mascolo and the Firm executed a retainer agreement. (PX 1). The Firm agreed to represent Gala, Solomon, and Mascolo in any and all matters relating to the transactions between Gala and Hewlett Packard, including civil, criminal, and tax matters, for a flat fee, exclusive of costs, of $500,000, again with the understanding that separate counsel for Mascolo probably would be required eventually.

The $500,000 fee was transferred from Gala to the Firm's escrow account on April 10, 1996 and was moved into an operating account a day or two later. The members of the Firm did not inquire as to the sources of the funds. Ruvoldt testified at the hearing that at the time the fee was paid, the Firm had no reason to inquire as to the source of

---

**3.** Neither Solomon nor Mascolo testified at the hearing. The Court was advised that both would invoke the Fifth Amendment privilege against self-incrimination if called to testify. (Tr. 2–3).

**4.** The primary disadvantage of a fixed fee arrangement is that "you never know exactly how much time is going to be involved in [any particular] matter." (Tr. 17). In the criminal defense field, although "ideally most lawyers would like

to get paid on a time-charge basis if they felt secure that the client was going to be able to pay them for all the time," many lawyers do take cases on a fixed fee basis. (Tr. 20). Of course, even when clients agree to a time-charge fee arrangement, they sometimes are unable to meet their obligations and courts often do not permit lawyers to withdraw from a case once the lawyers have formally appeared. (*See* Tr. 21–22).

the funds, nor any legal duty to do so. He testified that he had "no reason" to believe that the funds were proceeds of a crime. (Tr. 264). Nor was there any discussion at the time as to the possibility of a forfeiture action by the Government or any effort by Hewlett Packard to attach any monies paid to the Firm.

On April 26, 1996, Mascolo retained Cathy Fleming of Fleming, Roth & Fettweis ("Fleming Roth") to represent him in the criminal and civil proceedings relating to the Turner matter. Fleming Roth charged a flat fee of $150,000, inclusive of costs. The $150,-000 was paid to Fleming Roth by Gala.

On May 9, 1996, Gala sent Hewlett Packard a statement of account, requesting payment of $287,000. After Hewlett Packard refused to pay the bill, Gala brought this action in state court. Hewlett Packard removed the case to this Court and filed an answer with counterclaims, alleging that Gala, Solomon, and Mascolo conspired with Turner to defraud it.

In June 1996, the Firm's accounting department became concerned about the expenses being incurred in connection with the California criminal proceedings. Although the matter was in its early stages, the expenses already were high, and thus the accounting department spoke to Lederman about the disbursements. He spoke to the clients about an additional advance for disbursements. On June 14, 1996, an additional $270,000 was transferred by Gala to the Firm for disbursements. By June 14, 1996, then, some $920,000 of the $1.3 million had been paid by Gala to the lawyers. The Firm was aware of this fact.

On June 27, 1996, I issued a temporary restraining order and attachment order in this case.

On April 28, 1997, Mascolo was convicted by a jury on 14 counts of mail fraud and one count of conspiracy to commit money laundering.

In the meantime, Hewlett Packard moved for an order declaring the transfers of $500,-000 and $270,000 to the Firm and $150,000 to Fleming Roth subject to the order of attachment. I issued my Memorandum Decision and Order on May 28, 1997 denying the application as to the $150,000 fee to Fleming Roth, granting the application as to the $270,000 advanced to the Firm for expenses (except as to expenses incurred prior to June 27, 1996), and holding that a hearing was necessary to decide the application as to the $500,000 fee to the Firm, although I also concluded that the Firm's retainer agreement did not constitute a nonrefundable retainer agreement of the type prohibited by *In re Cooperman*, 83 N.Y.2d 465, 611 N.Y.S.2d 465, 633 N.E.2d 1069 (1994).

The hearing was held on July 15 and 21, 1997.

On September 22, 1997, Mascolo was sentenced to a term of 26 months imprisonment. The same day, both Solomon and Gala pled guilty to one count each of conspiracy to commit money laundering. Mascolo, Solomon, and Gala, as part of their respective sentencing and plea agreements, agreed to be jointly and severally liable to Hewlett Packard (or its subrogee insurance company) in the amount of $1,443,936.

### DISCUSSION

Hewlett Packard relies on both sections 273 and 276 of the New York Debtor and Creditor Law (the "DCL") to argue that the payment of the $500,000 fee to the Firm was a fraudulent conveyance. Section 273 does not require actual intent; a conveyance is constructively fraudulent under section 273 if the conveyance renders the transferor insolvent and was made without "fair consideration." DCL § 273; *see United States v. McCombs*, 30 F.3d 310, 323 (2d Cir.1994).

In contrast, for a conveyance to be fraudulent under section 276, it must be made "with actual intent ... to hinder delay, or defraud either present or future creditors." DCL § 276. Therefore, to prove a fraudulent conveyance under section 276 as to assets held by the Firm as a transferee, Hewlett Packard must demonstrate that Gala intended to hinder, delay, or defraud Hewlett Packard and that the Firm had actual or constructive knowledge of such intent. *See HBE Leasing Corp. v. Frank*, 48 F.3d 623, 636 (2d Cir. 1995); *Rolls–Royce Motor Cars, Inc. v.*

*Schudroff,* 929 F.Supp. 117, 128 (S.D.N.Y. 1996); *Adrian Tabin Corp. v. Climax Boutique, Inc.,* 34 N.Y.2d 210, 215, 356 N.Y.S.2d 606, 313 N.E.2d 66 (1974).

#### A. *Section 273*

■ I hold that Hewlett Packard has not proven a fraudulent conveyance under section 273 because Gala transferred the $500,-000 to the Firm in return for fair consideration—the Firm's commitment to represent Gala and at least one of its officers in criminal proceedings in California as well as in related civil and tax proceedings.

In a fraudulent conveyance claim under section 273, the burden is on the party challenging the conveyance to prove both insolvency and the lack of fair consideration. *McCombs,* 30 F.3d at 324 (quoting *American Inv. Bank v. Marine Midland Bank,* 191 A.D.2d 690, 595 N.Y.S.2d 537, 538 (2d Dep't 1993)).

Here, Gala received fair consideration. The sum of $500,000 was a reasonable fee for the services the Firm agreed to provide, given the amount of time that the Firm reasonably could be expected to spend on the matter. At the time the Firm set the fee, the criminal proceedings in California reasonably could have been expected to include: monitoring the Turner trial, preindictment advocacy, arraignment, pretrial preparation, pretrial motions, trial preparation, trial, sentencing, posttrial motions, and appeal. Civil proceedings could be expected to be time consuming as well, as Hewlett Packard could be expected to litigate the matter aggressively and thoroughly. Certainly, the criminal and civil proceedings could reasonably be expected to consume in excess of a thousand hours each for a partner and associate. At hourly rates of $375 for the partner (Ruvoldt)

and $150 for an associate, with additional time required for at least one other partner (Lederman) and a paralegal, a fee of $500,000 was well within the range of what could be considered reasonable. *See HBE Leasing,* 48 F.3d at 639 ("[D]efendants may choose to pay as much to their attorneys for their defense as they consider worthwhile, as long as the payments fall within a fair range of reasonable compensation for bona fide legal services").[5]

Hewlett Packard argues that the $500,000 fee was not fair consideration because at the time it was paid the intended legal services were "indefinite and of uncertain scope and duration." (*See* Letter to Court from Ronald G. Blum, Esq., dated September 8, 1997, at 5) (citing *inter alia HBE Leasing,* 61 F.3d 1054, 1060–61 (2d Cir.1995)). Although there was some uncertainty involved, the intended legal services were not so indefinite as to render the fee unfair. The key is that the Firm in good faith committed to provide *all* the legal services that would be necessary, and the Firm and the clients believed there would be a federal criminal prosecution in California as well as related civil litigation. The nature of a fixed fee, of course, is that the uncertainty requires both lawyer and client to assume certain risks, but these risks are part of the bargain. Here, the Firm assumed the risk that if more than $500,000 in time was required, it would be obligated to provide additional services without additional compensation. The clients assumed the risk that in the event that less than $500,000 in time was required, they would be paying a premium. Either way, however, the $500,000 figure was a reasonable amount for what could reasonably be expected to be required in legal services. Thus, the value of the legal services that the Firm committed to provide

5. In fact, Hafetz, the Firm's expert witness, testified that in his view the Firm made a "bad deal" for itself at the time. He explained the basis for his opinion as follows:

> $500,000 sounds like a lot of money, and it is a lot of money, and up front it is a lot of money. On the other hand, when you think it out, compared to the amount of time that they are going to be out of their office, out in California, involved in this trial, it is going to have an extremely negative impact on their ability to generate new matters and their ability to hang

on to the matters that they are already working on because of the loss of client contact.

(Tr. 52). He explained further that "for the scope of the work that was being taken on by the lawyers, ... the client got a pretty good deal here." (Tr. 54–55). Ruvoldt also believed that $500,000 would not be sufficient to cover the time that would be required.

With the benefit of hindsight, Ruvoldt was correct. As of the time of the hearing, the Firm had logged in excess of $1 million in time on the criminal and civil proceedings. (*See* Tr. 270).

was not "disproportionately small as compared with the value of the [fee] obtained" but rather was its "fair equivalent." DCL § 272 (defining fair consideration).

Hewlett Packard also argues that, even assuming $500,000 was fair consideration for the services to be provided by the Firm, the services were primarily for the benefit of Solomon rather than Gala. It argues, therefore, that Gala itself did not receive $500,000 worth of services and that, from Gala's point of view, fair consideration was not received.

This argument is rejected. At the time the Firm was retained, representation was to be provided not only for Solomon and Mascolo, but also for Gala. Gala was at the center of the controversy and the Firm's services certainly were intended to benefit Gala as well as Solomon and Mascolo. Indeed, although Hewlett Packard argued in its post-hearing submission that "Gala was never indicted and never needed to prepare a criminal defense" (Letter to Court from Ronald G. Blum, Esq., dated August 4, 1997, at 9), Gala was eventually indicted and pled guilty on September 22, 1997. Gala was the subject of plea discussions between Ruvoldt and the Assistant United States Attorney even before it was indicted. Gala was very much in need of a criminal defense from the outset.

Moreover, Gala is a privately-held company, solely owned, controlled, and operated by Solomon and Mascolo. For all intents and purposes, Solomon and Mascolo were Gala. With Solomon and Mascolo facing criminal charges, Gala's very existence was at risk. Hence, it was not inappropriate for Gala to spend a substantial portion of its resources to defend Solomon and Mascolo (see Tr. 111–12, 118–19), as long as it was not engaging in a fraudulent conveyance. See HBE Leasing, 48 F.3d at 638 ("[T]he fact that the consideration initially goes to third parties may be disregarded to the extent that the debtor indirectly receives a benefit from the entire transaction."). To the extent that the Firm conducted a joint defense of Gala, Solomon and Mascolo, it "effectively advanced the interests of all defendants simultaneously." Id. at 639.

Finally, the questions that led to my deciding to hold a hearing have been answered to my satisfaction. Although $500,000 is surely a substantial sum, retainers of this size or even larger are not unheard of, as Hafetz testified (see Tr. 67), and I am satisfied by the Firm's explanation as to why it requested such a fee here. Moreover, Gala, Solomon, and Mascolo turned to the Firm because of Solomon's 25–year relationship with Lederman. Solomon was willing to take on the extra expense of hiring a New York law firm to litigate a criminal matter in California because he trusted and had confidence in Lederman, and because New York counsel would be more accessible to him and Mascolo than California counsel as they both resided in the New York area. In addition, although the Firm did not have a reputation for doing criminal defense work, it had recently brought in Ruvoldt, who did have extensive experience in criminal law, to develop a white collar practice. And Gala was willing to spend virtually all of its remaining assets because the freedom of its sole shareholders and its continued existence were at stake.[6]

For all these reasons, I conclude that the fixed fee of $500,000 paid to the Firm by Gala was reasonable and was conveyed in return for fair consideration. Accordingly, Hewlett Packard's claim under section 273 is rejected.

### B. Section 276

I also hold that Hewlett Packard has not proven a fraudulent conveyance under section 276 because it has not shown that Gala paid the $500,000 to the Firm with the intent to hinder, delay, or defraud Hewlett Packard and because I find that, even assuming there was such a fraudulent scheme, the Firm did not have actual or constructive knowledge of it.

---

6. I was also provided at the hearing with an unredacted version of the retainer agreement as well as an explanation as to seemingly inconsistent statements made by the Firm in earlier proceedings in this case. (See Tr. 225–26, 274–75). In addition, the Firm provided a satisfactory explanation as to why it requested the additional $270,000 as an advance against costs. Most of these funds, in any event, are being returned to Hewlett Packard as I have held that they are subject to attachment.

Under section 276, actual intent to defraud must be proven by clear and convincing evidence. *See McCombs,* 30 F.3d at 328. Here, Hewlett Packard did not prove, by clear and convincing evidence, that the $500,000 was conveyed as part of a scheme to defraud. While Gala, Solomon, and Mascolo have now pled guilty and agreed to make restitution to Hewlett Packard in the amount of $1,443,936 based on the underlying events, Gala did not pay $500,000 to the Firm for the purpose of preventing Hewlett Packard from getting the money. There was no evidence that Gala retained any control over the funds after they were paid to the Firm or any evidence of any agreement on the part of the Firm to reconvey the funds to Gala at a later date. Indeed, as I have previously held, the fee became the Firm's property the moment it was paid, subject only to a partial refund in the event the Firm's services were prematurely terminated at a point when the circumstances would warrant a partial refund.

Although the effect of the payment was to deprive Hewlett Packard of the money, Gala paid the fee to the Firm not to intentionally deprive Hewlett Packard of the funds but to obtain legal representation. Accordingly, I conclude that the fee was a genuine one paid for bona fide legal services and that Gala was not seeking merely to "park" the money temporarily with the Firm to keep it out of Hewlett Packard's reach until it could later be retrieved.

Even assuming that Gala was seeking to prevent Hewlett Packard from getting the money back, however, I accept the testimony of Ruvoldt and Lederman that, from their point of view, the fee was a genuine one. Ruvoldt and Lederman believed that the Firm would be providing at least $500,000 worth of services. They certainly did not believe that Gala was paying the $500,000 to the Firm for the purpose of hiding it from Hewlett Packard. *See HBE Leasing,* 48 F.3d at 639 (holding that even "a transfer motivated by actual fraudulent intent may not be voided if a transferee who paid fair consideration did not have actual or constructive knowledge of such intent.").

■ Hewlett Packard argues that, even assuming the Firm did not have actual knowledge of Gala's intent to hinder, delay, or defraud Hewlett Packard, it had constructive knowledge of such intent because it should have but did not inquire into the source of the funds. The argument is rejected. First, again, as I have held, Gala paid the $500,000 to the Firm for legal services, not to prevent Hewlett Packard from reaching the money. Hence, Gala's intent in paying the fee was not to hinder, delay, or defraud Hewlett Packard. Second, even assuming that Gala's intent in paying the fee was fraudulent, in the circumstances of this case the Firm was not obliged to inquire any further than it did, for Ruvoldt and Lederman had no reason to believe that Gala conveyed the funds for any reason other than to obtain legal services.

The law provides little guidance on a lawyer's obligation to inquire as to the source of a client's fee. In the district court proceedings in the *HBE Leasing* case, Judge Goettel observed that:

> We know of no authority which requires attorneys to question the financial resources of their clients in paying their legal fees.... Nor do we believe it is required that attorneys defending civil claims evaluate the financial status of their clients before accepting payment of their fees. To place such a burden on attorneys would add intolerably to their problems.

*HBE Leasing Corp. v. Frank,* 837 F.Supp. 57, 63–64 (S.D.N.Y.1993). On the basis of this reasoning, Judge Goettel dismissed, without a hearing or trial, claims seeking to set aside as fraudulent conveyances the payment of certain fees to attorneys for representation in a civil case. The Second Circuit reversed the dismissal of the claims and remanded for further proceedings, holding that factual issues existed as to the debtor's intent in paying the attorneys' fees and the attorneys' knowledge of that intent. *HBE Leasing,* 48 F.3d at 639.

The Second Circuit's decision in *HBE Leasing* makes it clear that, in certain circumstances, lawyers do have a duty to inquire as to circumstances surrounding the payment of fees. Lawyers are not exempt from the provisions prohibiting fraudulent transfers. "Constructive knowledge of

fraudulent schemes will be attributed to transferees who were aware of circumstances that should have led them to inquire further into the circumstances of the transaction, but who failed to make such an inquiry." *HBE Leasing*, 48 F.3d at 636. Hence, lawyers who receive a conveyance under circumstances that should cause them to inquire into the reasons behind the conveyance must diligently do so, lest they be charged with knowledge of any intent on the part of the transferor to hinder, delay, or defraud. A lawyer who blindly accepts fees from a client under circumstances that would cause a reasonable lawyer to question the client's intent in paying the fees accepts the fees at his peril .[7]

Here, the circumstances did not require Ruvoldt and Lederman to inquire any further than they did. Solomon and Mascolo professed their innocence. Whether they were actually innocent or not, they were entitled to legal representation in any criminal proceedings brought against them. And whether Ruvoldt and Lederman believed Solomon and Mascolo to be guilty or not, they were willing to provide that representation and the Firm committed to provide services that it believed in good faith would be worth at least $500,000.

I assume that Lederman and Ruvoldt, as experienced lawyers, entertained at least some doubt with respect to their clients' protestations of innocence. After all, Ruvoldt believed that in excess of $600,000 worth of time would be required to defend against any charges, and in estimating the time that would be required, he factored in time for sentencing and appeal. Lederman acknowledged as well that, based on the discussions with the clients, he believed there was "substantial exposure." Even assuming, however, that Ruvoldt and Lederman entertained

the possibility that Solomon, Mascolo, and/or Gala had engaged in wrongdoing, Ruvoldt and Lederman had no reason to believe that Gala was paying the $500,000 not for legal representation but to prevent Hewlett Packard from obtaining the funds.

Because Hewlett Packard has not met its burden of proving fraudulent intent and the Firm did not have either actual or constructive knowledge of any intent to defraud on the part of Gala, the section 276 claim fails as well.

## CONCLUSION

Hewlett Packard's application for an order holding that the $500,000 fee paid to the Firm is subject to attachment in this case as a fraudulent conveyance is denied.

SO ORDERED.

---

**7.** Attorneys in criminal cases must also inquire as to the source of the clients' funds if forfeiture is a possibility. As the Supreme Court has made clear:

A defendant has no Sixth Amendment right to spend another person's money for services rendered by an attorney, even if those funds are the only way that the defendant will be able to retain the attorney of his choice. A robbery suspect, for example, has no Sixth Amendment right to use funds he has stolen from a bank to

retain an attorney to defend him if he is apprehended. The money, though in his possession, is not rightfully his; the Government does not violate the Sixth Amendment if it seizes the robbery proceeds and refuses to permit the defendant to use them to pay for his defense. *Caplin & Drysdale v. United States*, 491 U.S. 617, 626, 109 S.Ct. 2646, 105 L.Ed.2d 528 (1989). *See, e.g.,* 18 U.S.C. §§ 981 (civil forfeiture), 982 (criminal forfeiture).