RTC MORTGAGE TRUST
1995–S/N1, Plaintiff,

v.

Jacob I. SOPHER and J.I. Sopher
Realty, Inc., Defendants.

No. 99 Civ. 1345(WHP).

United States District Court,
S.D. New York.

April 25, 2001.

Jeffrey T. Golenbock, Golenbock, Eiseman, Assor & Bell, New York City, for plaintiff.

Samuel Kirschenbaum, Kirschenbaum & Kirschenbaum, P.C., Garden City, NY, for defendants.

### DECISION AND ORDER

PAULEY, District Judge.

This is the third in a series of actions brought by plaintiff RTC Mortgage Trust 1995–S/N1, a mortgagee, in connection with four New York City professional condominium units owned by J.I. Sopher & Co. and subject to a mortgage and guaranty executed as security for a debt of $4,200,000. After commencing a foreclosure action and a second action to recover the deficiency, plaintiff brings this diversity action pursuant to the New York Debtor and Creditor Law ("DCL") to declare as fraudulent the 1993 conveyance by J.I. Sopher & Co., Inc. of certain of its assets to a newly-formed company, Sopher Realty. This decision and order sets forth this Court's findings of fact and conclusions of law, as required by Rule 52 of the Federal Rules of Civil Procedure, following a bench trial.

### Findings of Fact

Plaintiff RTC Mortgage Trust 1995–S/N1 (the "Trust") is a business trust organized under the laws of the State of the Delaware, with its principal place of business in Bethesda, Maryland. (Joint Pretrial Order dated March 24, 2000 ("JPTO") at 2.) Defendant J.I. Sopher Realty, Inc. ("Sopher Realty") is a corporation organized under the laws of the State of New York, with its principal place of business in New York, New York. (JPTO at 2.) Defendant Jacob I. Sopher ("Sopher"), the sole shareholder of J.I. Sopher & Co., Inc. ("Sopher & Co."), is a citizen of New York. (JPTO at 2; Stipulated Statement of Facts ("Stip.") ¶ (j).) The amount in controversy totals at least $1,889,264.89, the amount of the judgment obtained by the Trust against Sopher & Co. in an earlier action filed in this District.

#### A. The prior actions and judgments

Sopher & Co. was the mortgagor and Old Stone Bank the original mortgagee on a Mortgage and Security Agreement and Consolidation dated April 23, 1987 (the "Mortgage"). (Stip.¶ (a).) The Mortgage secured a note in the principal amount of $4,200,000 executed by Sopher & Co. in favor of Old Stone Bank, dated April 23, 1987, and covered four professional condominium units located at 425 East 61st Street, New York, New York (the "Note"). (Stip.¶ (b).) In connection with the Note and Mortgage, Sopher & Co. executed a Debt Service Guaranty dated April 23, 1987 (the "Guaranty") in which Sopher & Co. "unconditionally guaranteed the prompt payment of all payments of all interest, charges and debt service payable by [Sopher & Co.] under the Note and/or the Mortgage ... and all operating expenses of the mortgaged premises...." (See Stip. ¶ (c).) In May 1992, Sopher & Co. and Old Stone Bank entered into a

Loan Modification Agreement extending the maturity date of the Note until April 22, 1997 and reaffirming Sopher & Co.'s obligations under the Guaranty. (Stip.¶ (d).)

In April 1993, Sopher & Co. failed to make its monthly payment under the Note (Stip.¶ (e)) and thereafter ceased making future payments (Trial Transcript ("Tr.") at 84; Deposition of Sharon Thomas ("Thomas Dep.") at 26–28). In October 1994, Resolution Trust Corporation ("RTC"), as receiver of Old Stone Bank, filed an action in this District to foreclose on the Mortgage, captioned *Resolution Trust Corporation and RTC Mortgage Trust 1995–S/N1 v. J.I. Sopher & Co.*, 94 Civ. 7189(DC). (Stip.¶ (f).) During the pendency of the foreclosure action, the Mortgage, Note and Guaranty were sold by RTC to the Trust, which in turn was added as a plaintiff in the foreclosure action. (Stip.¶ (f).) RTC has a 51% interest in the Trust. (Tr. at 4.) In that action, the district court awarded summary judgment to the plaintiffs and entered a Final Judgment of Foreclosure and Sale dated March 9, 1996, providing in part for the sale of the mortgaged property and affording the Trust the right to commence separate proceedings against Sopher & Co. (or High Rise Realty Co. as it became known) to enforce the Guaranty to the extent the sale of the property resulted in a deficiency. (Stip.¶ (f); Plaintiff Exhibit ("PX") 45.)

On April 18, 1996, the mortgaged property was auctioned and sold to an affiliate of the Trust for $1,500,000. (Stip.¶ (g).) In June 1996, pursuant to the judgment in the foreclosure action, the Trust instituted another action in this District, captioned *RTC Mortgage Trust 1995–S/N1 v. J.I. Sopher & Co., Inc.*, 96 Civ. 4992(DC). In this second action, the Trust sought to enforce the Guaranty and recover all unpaid interest, charges, and debt service

due under the Note and Mortgage as well as other expenses due. (Stip.¶ (h).) On April 20, 1998, the district court granted summary judgment to the Trust and entered judgment against Sopher & Co. in the amount of $1,889,264.98 (the "Judgment"). (Stip.¶ (i); PX–46.) Having been unsuccessful in its efforts to satisfy of the Judgment (Tr. at 11), the Trust commenced the present action.

## B. *The facts underlying this action*

In April 1993, Sopher together with his accountant, Stuart Becker, developed a plan to transfer certain of the assets of Sopher & Co. to a newly-formed corporation while retaining as many liabilities as possible, including the Mortgage, in Sopher & Co. (Tr. at 40–42; PX–39; PX–42.) The timing of this plan coincided with Sopher & Co.'s default on its monthly payments under the Mortgage. (*See* PX–38 at ¶ 17.) In a letter dated April 15, 1993, Sopher wrote to his attorney, with a copy to Becker, inquiring about the consequences of default "on the April and May payments to Old Stone Bank which is now under the auspices of RTC." (PX–40.) Sopher specifically inquired about whether the Trust had to notify Sopher & Co. before drawing on a certificate of deposit that he posted in the event "they find out about [the default]" and whether filing a chapter 11 petition in bankruptcy court would preclude the Trust from doing so. (PX–40.)

On May 18, 1993, Sopher again wrote to his attorney and accountant, informing them that the company was "in default for April and May" as to the condominium units. (PX–39.) Sopher stressed the importance of completing the spinoff promptly before the start of any litigation: "If the spin off is not completed immediately, there will be nothing for Blumenthal [Sopher's attorney] to defend." (PX–39.) So-

pher also solicited advice on whether the spinoff could be backdated if it were not completed prior to litigation. He wrote:

> If they serve us papers before the spin off, it would appear that it would be too late to consummate same. We have to expect papers at any time. Can we get the spin off finished today? How will it be documented (the date that it was spun off)—so that when papers are served it will be after the spin off?

(PX–39.)

On or about June 17, 1993, approximately six weeks after it ceased making payments on the Note, Sopher & Co. completed the planned corporate reorganization and spinoff. Sopher & Co. changed its name to High Rise Realty Co., Inc. ("High Rise"); formed Sopher Realty, a New York corporation with Sopher as its sole shareholder; and transferred to Sopher Realty all of its property and assets except for the four condominium units, a lease on one of the units, and the New Jersey real estate brokerage business. (Stip.¶ (j); PX–43; PX–44.) The plan of reorganization recited that Sopher Realty shall not assume "any debts, liabilities, contracts or obligations of High Rise Realty," expressly providing that it "shall not assume any liability under the Mortgage Note dated April 23, 1987." (PX–44.) In exchange for the assets transferred to Sopher Realty, Sopher & Co. (now High Rise) received only stock of Sopher Realty, which immediately was distributed as a dividend to Sopher. (Stip.¶ (k); Tr. at 77; PX–44.)

Even after the spinoff and transfer of assets, Sopher continued to express to Becker his concern that Sopher & Co. would be sued and wanted to ensure that in such an event there would be no assets for the mortgagee to collect. In particular, on June 21, 1993, Sopher told Becker that he should consult a bankruptcy attorney from a related matter and suggested

that his "insight and advice should be incorporated before we formalized the spin off." (PX–42.) Noting that the spinoff was to "leav[e] as much liability as possible" in Sopher & Co., Sopher wanted to ensure "that if we are attacked it will be held in Bankruptcy Court (the liability is left in the corporation etc.)." (PX–42.)

The assets transferred from Sopher & Co. to Sopher Realty in connection with the spinoff had substantial value. Those assets included a loan from Sopher & Co. to Jacob Sopher valued at $1,171,425 as of December 31, 1992 and the goodwill value of the Sopher name, a non-balance sheet item. (Tr. at 70; PX–4; PX–25.) For the year ended December 31, 1993, the year of the spinoff, the Sopher Realty financial statements reflected assets totaling $1,913,331. (PX–29.) Moreover, the business of Sopher Realty continued to generate millions of dollars in revenue. (PX–11; PX–29.) In 1997, the assets of Sopher Realty, excluding the loan to Sopher, were sold to Douglas Elliman for $1,500,000. (Stip.¶ (1).) Thus, at a minimum, the value of the assets transferred to Sopher Realty as part of the spinoff exceeded $2,600,000 ($1,500,000 plus the loan to Sopher of $1,171,425).

In contrast, the Sopher & Co (High Rise) financial statements for that same period reveal that the company held virtually no assets apart from the condominium units—only $8,262 in cash and an accounting entry relating to mortgage financing costs. (PX–26.) After the spinoff, Sopher & Co. generated no real estate brokerage income. (Thomas Dep. at 84.)

Sopher & Co. was insolvent at the time of the spinoff and transfer of assets and remained insolvent following the transaction. Sopher testified that Sopher & Co. experienced "serious financial difficulties due to the downturn in the real estate market" (PX–38 at ¶ 17 (Affidavit of Hank

(Jacob) Sopher sworn to March 24, 1995)) and that the downturn caused the company to incur "mountains of debt" (Deposition of Jacob Sopher ("Sopher Dep.") at 150). Sopher affirmatively testified that as of June 1993 the liabilities of Sopher & Co. "by far" exceeded its assets and that he did think the company was able to pay all its debts as they came due, including the Mortgage. (Sopher Dep. at 150–51; *see also* PX–38 at ¶ 17.)

The relevant financial statements verify that at the time of the spinoff, Sopher & Co.'s liabilities far exceeded its assets. As of December 31, 1992, Sopher & Co.'s reported liabilities totaled $4,610,185, consisting for the most part of the debt on the Mortgage. (PX–25.) For the same time period, the company's reported assets totaled $4,895,466, comprised substantially of the $1,171,425 loan to Sopher and the $3,235,766 book value of the condominiums, less depreciation. (PX–25 at 1 & note 1(c).) Although the balance sheet shows net assets of $285,281, this figure is belied by more probing analysis. In the prior foreclosure action, Sopher set the fair market value, as distinguished from the book value, of the condominiums in April 1993 at $1,800,000. (PX–38 at ¶ 17.) In making this determination, Sopher "relied upon an appraisal which was made by Citibank for the fifth floor in the Building which was identical in size and configuration to each of the two floors of the [condominiums]." (PX–38 at ¶ 17.) Inserting the fair market value as determined by Sopher for the book value listed in the financial statements, Sopher & Co.'s liabilities exceeded its assets by approximately $1,200,000. In addition, the balance sheet for the year ended December 31, 1993 showed that Sopher & Co.'s liabilities significantly exceeded its assets, even valuing the condominiums at book. (PX–26.)

This Court rejects the testimony by Becker, the only witness called at trial by defendants, that Sopher & Co. was solvent at the time of the reorganization. Becker's reliance on the appraisal by Old Stone Bank valuing the condominiums at $3,600,000 is conclusively impeached by his client's statements in the foreclosure action. Not only did Sopher represent that the value of the condominium units was $1,800,000, but he assailed the appraisal as "shocking" due to the fact that an identical floor in the same building, comprising two units, sold for only $900,000. (PX–38 at ¶¶ 44–47.)

Further, Becker's testimony that the rent from a tenant, the Psychiatric Institutes of America ("PIA"), enabled Sopher & Co. to service the mortgage is refuted by a number of facts. First, Sopher, again, critically undermined the testimony of his own witness. According to Sopher, by July 1993, "it had become clear that PIA would likely soon vacate the Premises as a result of various fraud charges brought [against] it by the federal government . . . and its parent." (PX–38 at ¶ 21.) Sopher & Co. could not have relied on the comfort of PIA's lease payments to service its mortgage debt or to impute value to its balance sheet by capitalizing its rental stream. Second, Becker conceded at trial that neither he nor anyone else prepared an analysis of the company's ability to pay its debts as they came due; Becker did not even know the amount of accounts payable at the time of spinoff. (Tr. at 76, 85–86.) Thus, Becker's conclusion as to Sopher & Co.'s solvency amounted to nothing more than a guess. After viewing Becker's demeanor at trial, this Court declines to credit his testimony for the additional reason that he lacked credibility.

Defendants, through Becker, also attempt to justify the spinoff and transfer of assets on grounds related to separating

Sopher & Co.'s component businesses on a tax-free basis and allowing the brokerage operations to be positioned for sale. (Tr. at 39–41.) However, none of the communications among Sopher, Becker and Sopher's attorney concerning the transaction alludes to any legitimate business purpose behind the plan of reorganization. Rather, the documentary evidence demonstrates Sopher's preoccupation with protecting assets and avoiding liability to creditors, namely the mortgagee. (See PX–39; PX–40; PX–41; PX–42.) In fact, as Becker admitted at trial, "[t]here was no specific tax purpose" for the transaction because both Sopher & Co. and Sopher Realty were subchapter S corporations, and thus the "profit and loss of each entity would flow through to Mr. Sopher individually." (Tr. at 44; see also Tr. at 45 ("from a tax perspective it really made no difference").) Further, the notion that the transaction was driven by "financial planning" concerns so as to avoid encumbering the balance sheet is not borne out by the facts. (See Tr. at 45.) The decision to transfer the $1.1 million loan receivable from Sopher proves that defendants were not concerned about a clean balance sheet, but with picking and choosing the assets to be placed in Sopher Realty. (See Tr. at 103.) If defendants simply desired to sell the brokerage business, there was no reason to engage in a spinoff and distribute equity shares; even Becker noted that the original "intention" was not to issue stock. (Tr. at 103.) To effectuate a sale of the assets of the brokerage operations, Sopher & Co. easily could have carved out the line items on the balance sheet relating to the condominium units.

The lack of a legitimate business purpose for the spinoff is highlighted by the cessation of Sopher & Co.'s operations after the spinoff and transfer of assets. Sopher & Co. (High Rise) conducted no business and generated no income; Sopher Realty merely assumed the same business that until the spinoff had been conducted by Sopher & Co. (See Thomas Dep. at 20–23, 84; Sopher Dep. at 19–23, 152.) Sopher & Co. existed only as a shell corporation that held title to the four condominium units. (See Thomas Dep. at 22–23.)

In a similar vein, the Sopher entities' failure to comply with corporate formalities, both before and after the spinoff, strongly suggests that Sopher used his companies as alter egos to further his own personal interests rather than the separate interests of the companies. Foremost, as mentioned earlier, Sopher caused Sopher & Co. to extend a loan to him in excess of $1 million, interest free and without executing any documentation, so that he could pay his taxes. (Sopher Dep. at 65.) In 1987, Sopher & Co. loaned Sopher $325,621 (PX–20), an amount that increased to $1,880,955 in 1988 and remained at that level until 1990. (PX–22 at 4; PX–23 at 5.) By end of 1991, the loan was reduced to $1,213,431 and at the end of 1992 it totaled $1,171,425. (PX–25 at 4.) Notwithstanding its deteriorating financial condition, Sopher & Co. never demanded payment on the loan. (Thomas Dep. at 70.)

In addition, the Sopher entities did not hold board of directors or shareholder meetings or elections of officers and did not maintain corporate minutes. (Sopher Dep. at 28–29, 33–34; Thomas Dep. at 32–35, 39–40.) Sopher & Co. (High Rise) and Sopher Realty (as well as other Sopher entities) shared the same officers, directors and employees. (Sopher Dep. at 19–23, 25–28, 31–32; Thomas Dep. at 16–23, 64, 85–86.) In addition, Sopher & Co. (High Rise) shared office space and telephone numbers with other companies, including Sopher Realty, without apportioning rent or otherwise seeking reimbursement and generally failed to distinguish work completed for either entity.

(*See* Sopher Dep. at 9–13, 24; Thomas Dep. 32, 59, 85–86.)

## Conclusions of Law

The Trust alleges three claims in an effort to set aside the 1993 spinoff and transfer of assets and to reach Sopher & Co.'s assets to satisfy the Judgment: (i) a claim against Sopher Realty and Sopher individually for constructive fraud pursuant to DCL § 273 on the basis that Sopher & Co. was insolvent at the time of the transfer and that the transfer lacked adequate fair consideration; (ii) a claim against Sopher Realty and Sopher individually for actual fraud pursuant to DCL § 276 on the basis that the transfer was made with actual intent to hinder, delay or defraud creditors; and (iii) a claim against Sopher on the basis that he dominated and controlled Sopher & Co. and Sopher Realty and should be liable for the debts of Sopher & Co., including the amounts due under the Judgment. By way of relief, the Trust seeks an order declaring as fraudulent the 1993 spinoff and transfer of assets and awarding damages up to the amount of the Judgment pursuant to DCL § 278. In addition, the Trust petitions for an award of attorneys' fees pursuant to DCL § 276–a.

As their main defense to this action, defendants assert that the failure of the Trust to seek and obtain a deficiency judgment, as set forth in section 1371 of the New York Real Property Actions and Proceedings Law, bars the Trust from collecting a money judgment and requires vacatur of the Judgment. This issue has been resolved unfavorably to defendants three times: first by District Judge Chin in the 1994 foreclosure action (*see* Final Judgment of Foreclosure and Sale, 94 Civ. 7189, dated March 9, 1996); second by the Second Circuit on appeal from Judge Chin's order in *Resolution Trust Corpora-*

*tion v. J.I. Sopher & Co., Inc.,* 108 F.3d 329, 1997 WL 100879 (2d Cir.1997) (unpublished opinion); and third by this Court on summary judgment in this action (*see* Transcript of Hearing dated August 6, 1999). With three strikes against defendants, there is no need to revisit the issue for a fourth time.

### A. Constructive fraud pursuant to DCL § 273

Section 273 of the DCL provides: "Each conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors made without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration." N.Y. Debt. & Cred. Law § 273 (McKinney 1990). Thus, Section 273 covers constructive, as opposed to actual, fraud and prohibits conveyances, made without fair consideration, that render or will render the transferor insolvent. *See United States v. McCombs,* 30 F.3d 310, 323 (2d Cir.1994); *Gala Enters., Inc. v. Hewlett Packard Co.,* 989 F.Supp. 525, 528 (S.D.N.Y.1998); *Shelly v. Doe,* 249 A.D.2d 756, 757, 671 N.Y.S.2d 803, 805 (3d Dep't 1998). Section 273 places the burden of proving lack of fair consideration upon the creditor challenging the conveyance. *McCombs,* 30 F.3d at 324; *American Inv. Bank v. Marine Midland Bank, N.A.,* 191 A.D.2d 690, 692, 595 N.Y.S.2d 537, 538 (2d Dep't 1993). When a transfer is made without consideration, courts have applied a presumption of insolvency that shifts the burden to the defendant to rebut by showing continued solvency after the transaction. *See In re Corcoran,* 246 B.R. 152, 163 (E.D.N.Y.2000); *United States v. Red Stripe,* 792 F.Supp. 1338, 1342 (E.D.N.Y. 1992); *In re O.P.M. Leasing Servs., Inc.,* 40 B.R. 380, 392 (Bankr.S.D.N.Y.), *aff'd,* 44 B.R. 1023 (S.D.N.Y.1984); *Shelly,* 249 A.D.2d at 757, 671 N.Y.S.2d at 805.

This Court finds that the June 1993 transaction involving the spinoff and transfer of assets from Sopher & Co. to Sopher Realty constituted a fraudulent conveyance in violation of Section 273. As Sopher testified, Sopher & Co. was insolvent at the time of the transfer and was unable to pay its debts as they became due. *See* N.Y. Debt. & Cred. Law § 271 (McKinney 1990) ("A person is insolvent when the present fair salable value of his assets is less than the amount that will be required to pay his probable liability on his existing debts as they become absolute and matured."). Equally indicative of insolvency, Sopher & Co.'s financial statements for the relevant period show that when the company's assets are calculated using the fair market value of the condominium units (as opposed to the book value), the company's liabilities exceeded its assets. *See In re Le Café Creme Ltd.*, 244 B.R. 221, 240–41 (Bankr.S.D.N.Y.2000) (applying the "balance sheet" test to determine insolvency). Moreover, there was no fair consideration given for the transfer of assets to Sopher Realty. In exchange for the transfer of over $2,600,000 in assets, Sopher & Co. received only newly-issued stock that immediately was distributed as a dividend to Sopher, Sopher & Co.'s principal manager and sole shareholder. Apart from the lack of consideration, dividending the stock to Sopher negates the element of "good faith" that is indispensable to a finding of fair consideration. *See* N.Y. Debt. & Cred. Law § 272 (McKinney 1990) (defining "fair consideration" as "[w]hen in exchange for such property ... as a fair equivalent therefor, and in good faith, property is conveyed"); *In re Le Café Creme*, 244 B.R. at 241 (element of fair consideration "not met when good faith component ... is missing"). At no time did the parties to the 1993 transfer intend to impart to Sopher & Co. a fair equivalent of the assets conveyed to Sopher Realty.

### B. *Actual fraud pursuant to DCL § 276*

For a conveyance to be fraudulent under Section 276, it must be made "with actual intent, as distinguished from intent presumed in law, to hinder, delay or defraud either present or future creditors." N.Y. Debt. & Cred. Law § 276 (McKinney 1990). Thus, where actual intent to defraud creditors is proven, the conveyance will be set aside regardless of the adequacy of consideration exchanged. *See Pashaian v. Eccelston Properties, Ltd.*, 88 F.3d 77, 86 (2d Cir.1996). The plaintiff must prove actual intent "by clear and convincing evidence." *McCombs*, 30 F.3d at 328; *Marine Midland Bank v. Murkoff*, 120 A.D.2d 122, 126, 508 N.Y.S.2d 17, 20 (2d Dep't 1986).

In addition and in the alternative to the findings relating to the Trust's claim pursuant to DCL § 273, this Court finds that Sopher & Co. transferred and Sopher Realty received the non-condominium assets with actual intent to hinder, delay and defraud the Trust as mortgagee. This Court also finds that the transaction was planned and executed with the knowing and active participation of Sopher.

While fraudulent intent is "rarely susceptible to direct proof." *Marine Midland*, 120 A.D.2d at 128, 508 N.Y.S.2d at 22, such proof is available in this case. Sopher's memoranda to his legal and financial advisors prepared prior to, at the time of, and following the spinoff and transfer of assets demonstrate by clear and convincing evidence that Sopher sought to strip Sopher & Co. of its productive assets and to retain as much liability in the company as possible, including the Mortgage, with the purpose of frustrating the Trust's anticipated efforts to enforce the terms of the Mortgage and Note and collect on the Guaranty. (*See* PX–39; PX–

40; PX–41; PX–42.) Those memoranda also demonstrate that the business justifications proffered by Becker at trial were pretextual, a fact that only reinforces the clear intent to avoid liability on the Guaranty.

■ Beyond the direct evidence, the circumstantial evidence, or so-called "badges of fraud," further establish proof of fraudulent intent. The "badges of fraud" include: (i) a close relationship between the parties to the transaction; (ii) a questionable transfer not in the ordinary course of business; (iii) inadequacy of consideration; (iv) the transferor's knowledge of the creditor's claim and his inability to pay it; and (v) retention of control of the property by the transferor after the conveyance. *See Wall Street Assocs. v. Brodsky,* 257 A.D.2d 526, 529, 684 N.Y.S.2d 244, 248 (1st Dep't 1999); *Shelly,* 249 A.D.2d at 758, 671 N.Y.S.2d at 806.

Here, the spinoff and transfer of assets occurred within weeks of Sopher & Co.'s insolvency and default on its commitment under the Mortgage, was made between two related companies owned solely by Sopher and without fair consideration, and permitted a Sopher-owned entity to retain control over the $1.1 million loan receivable and other assets. In addition, the evidence shows that Sopher picked and chose among the assets to be placed in the newly-formed Sopher Realty without regard to any plausible financial planning concerns related to selling the real estate brokerage business. Taken together, those facts compel the conclusion that the transaction was completed with the hope of continuing the Sopher real estate brokerage business in a separate corporation, unencumbered by any debt to the mortgagee, and defeating the ability of Sopher & Co.'s creditors from reaching the $1.1 million loan advanced to Sopher.

**C. Relief pursuant to DCL § 278 and DCL § 276–a**

■ DCL § 278 provides in pertinent part:

> Where a conveyance or obligation is fraudulent as to a creditor, such creditor, when his claim has matured, may, as against any person except a purchaser for fair consideration without knowledge of the fraud at the time of the purchase, or one who has derived title immediately or mediately from such purchaser ... [h]ave the conveyance set aside or obligation annulled to the extent necessary to satisfy his claim.

N.Y. Debt. & Cred. Law § 278(1)(a) (McKinney 1990). Accordingly, the Trust is entitled to judgment against Sopher Realty, the transferee, up to the value of the Judgment, but limited to the extent of the value of the assets transferred by Sopher & Co. to Sopher Realty. *See Hassett v. Goetzmann,* 10 F.Supp.2d 181, 191 (N.D.N.Y.1998); *Red Stripe,* 792 F.Supp. at 1344–45. This does not appear to impede the Trust's ability to recover given that the value of the assets transferred, approximately $2,600,000, surpasses the amount of the Judgment. Because the assets transferred no longer exist, a money judgment is proper. *See Lending Textile, Inc. v. All Purpose Accessories,* 174 Misc.2d 318, 320, 664 N.Y.S.2d 979, 981 (1st Dep't 1997); *Manufacturers & Traders Trust Co. v. Lauer's Furniture Acquisition, Inc.,* 226 A.D.2d 1056, 1057, 641 N.Y.S.2d 947, 948–49 (4th Dep't 1996).

■ The Trust further asserts that Sopher should be held individually liable by reason of his participation in the fraudulent transfer. Under New York law, a creditor may recover money damages against parties who participate in the fraudulent transfer and are either transferees of the assets or beneficiaries of the conveyance. *See Stochastic Decisions,*

*Inc. v. DiDomenico*, 995 F.2d 1158, 1172 (2d Cir.1993) (applying New York law); *FDIC v. Porco*, 75 N.Y.2d 840, 842, 552 N.Y.S.2d 910, 911–12, 552 N.E.2d 158 (1990); *Contractors Cas. & Sur. Co. v. I.E.A. Elec. Corp.*, 181 Misc.2d 469, 472, 693 N.Y.S.2d 915, 917 (N.Y.Sup.1999).

 The evidence establishes that Sopher, as the sole shareholder of Sopher & Co., sought to transfer substantially all of Sopher & Co.'s assets in order to frustrate the mortgagee's collection efforts. It also demonstrates that Sopher actively participated in planning and executing the transaction. While not a direct transferee, Sopher plainly benefitted from the transaction. By operation of the transfer, Sopher removed millions of dollars of assets from Sopher & Co. and, thereby, was able to continue his real estate brokerage business until it was sold for $1,500,000. Sopher also benefitted from the transaction because it prevented (or at least forestalled) circumstances that required repayment of the loan advanced to him by Sopher & Co. Accordingly, Sopher also is liable in money damages up to the value of the Judgment, but limited to the extent of the value of the assets transferred by Sopher & Co. to Sopher Realty.

 The Trust seeks further relief by way of attorneys' fees pursuant to DCL § 276–a. DCL § 276–a provides, in relevant part, that attorneys' fees should be awarded when a conveyance "is found to have been made by the debtor and received by the transferee with actual intent, as distinguished from intent presumed in law, to hinder, delay or defraud either present or future creditors." N.Y. Debt. & Cred. Law § 276–a (McKinney 1990). Thus, " § 276–a provides for attorneys' fees in the event a party proves that a transfer is made and received with actual intent." *Hassett*, 10 F.Supp.2d at 190; *see also Carey v. Crescenzi*, 923 F.2d 18, 21

(2d Cir.1991). As set forth fully in section B above, the Trust has established by clear and convincing evidence that Sopher & Co. and Sopher Realty acted with actual intent to hinder, delay and defraud the mortgagee in connection with the spinoff and transfer of assets. The Trust also has established that Sopher knowingly participated in the transactions and benefitted from them.

As a result, this Court awards the Trust attorneys' fees, incurred in connection with this action only, from Sopher Realty and Sopher.

### D. *Sopher's liability based on piercing the corporate veil*

The Court next turns to the Trust's third cause of action. While the nature of this claim is not entirely clear, the Trust seems to urge this Court to disregard the separate existence of Sopher & Co. and find Sopher "personally liable for the Judgment of $1,889,264.89 obtained by plaintiff against Sopher & Co." (Pltf.'s Post–Trial Mem. Of Law at 24.) Although the factual record before this Court supports a finding that Sopher & Co. was a mere instrumentality of Sopher, this cause of action must be dismissed for failure to state a claim.

 Under New York law "an attempt of a third party to pierce the corporate veil does not constitute a cause of action independent of that against the corporation; rather it is an assertion of facts and circumstances which will persuade the court to impose the corporation obligation on its owners." *Morris v. New York State Dep't of Taxation & Fin.*, 82 N.Y.2d 135, 141, 603 N.Y.S.2d 807, 810, 623 N.E.2d 1157 (1993). Thus, the domination and control by Sopher of Sopher & Co. is a condition that does not entitle the Trust to independent relief, but will only allow the

Trust to hold Sopher liable for the wrongs committed by Sopher & Co. Sopher & Co., however, is not party to this litigation and no independent cause of action is asserted against it. In this Court's view, the Trust is seeking relief that properly should have been sought in the 1996 action on the Guaranty before Judge Chin. Accordingly, the claim is dismissed.

## Conclusion

For the reasons stated, the 1993 spinoff and transfer of assets from Sopher & Co. to Sopher Realty constitutes a fraudulent conveyance within the meaning of DCL §§ 273 and 276. This Court also concludes that Sopher knowingly participated in and benefitted from the fraudulent conveyance. Accordingly, judgment is awarded to the Trust against Sopher Realty and Sopher individually for money damages up to the value of the Judgment plus interest, but limited to the extent of the value of the assets transferred by Sopher & Co. to Sopher Realty. The Trust's third cause of action is dismissed for failure to state a claim. In addition, defendants' affirmative defense and counterclaim based on Section 1371 of the New York Real Property Actions and Proceedings Law is dismissed.

Further, this Court awards the Trust attorneys' fees, in connection with this action only, against Sopher Realty and Sopher in an amount to be determined. The Trust is directed to submit its fee application together with supporting affidavits within ten days of the date of this decision and order. Defendants may submit any objections within ten days of their receipt of the Trust's application.

Upon determination of the amount of attorneys' fees, this Court will enter judgment against defendants consistent with this decision and order. The parties shall submit a form of proposed judgment for this Court's consideration by May 11, 2001.