AMUSEMENT INDUSTRY,
INC., Plaintiff,

v.

MIDLAND AVENUE ASSOCIATES, LLC; Stephen Stern; Joshua Shapiro (a/k/a Joshua Schapiro a/k/a Joshua Schapira); Payless Office Products Corp.; Joseph Niederman; Kesef Properties, Inc.; Benjamin Irwin LLC; SME International Associates, Inc. (a/k/a SME International Associates a/k/a SME Associates a/k/a SME International); Moses Stern (a/k/a Mark Stern); First Republic Group Corp.; Malke Malik, Tovia Malik, Matthew Solof, Does 4–10, inclusive, and XYZ Corp. 1–10, inclusive, Defendants.

No. 10 Civ. 5064(LAK)(GWG).

United States District Court,
S.D. New York.

Sept. 27, 2011.

512

Allen Phillip Sragow, Sragow & Sragow, Craig Harry Missakian, Westland Industries, Inc., Long Beach, CA, Elissa E. Koolyk, Elissa E. Koolyk, Esq., New York, NY, for Plaintiff.

Stephen R. Stern, Mark W. Geisler, Hoffinger Stern & Ross LLP, Sherri Lee Eisenpress, Nicole Haff, Reiss, Eisenpress and Sheppe LLP, New York, NY, Steven B. Lieberman, Law Office of Steven B. Lieberman, Somerville, NJ, for Defendants.

### *ORDER*

LEWIS A. KAPLAN, District Judge.

This matter is before the Court on the separate objections of plaintiff (DI 73) and the Mark Stern Defendants (DI 70) to the report and recommendation of Magistrate Judge Gabriel W. Gorenstein (the "R&R") (DI 69) with respect to motions by Stephen

Stern, the Mark Stern Defendants, and Joshua Shapiro and others (the "Other Defendants") to dismiss the amended complaint.

The objections of the Mark Stern Defendants are entirely without merit and are overruled. A motion to dismiss a complaint assumes the truth of the pleading's well pleaded factual allegations. Characterizing such factual allegations as "conclusory" does not justify disregarding this basic principle.

Plaintiff's objection to the recommended dismissal of the complaint as against Joseph Neiderman and Joshua Shapiro rests on a theory that was not advanced before the magistrate judge. This court will not entertain it as this stage.

Accordingly:

1. The motion of defendant Stephen Stern to dismiss the amended complaint (DI 21) is granted to the extent the constructive fraudulent conveyance claim (count 1), the aiding and abetting fraudulent conveyance claim (count 3), the aiding and abetting fraudulent conveyance with intent to defraud claim (Count 4) and the aiding and abetting fraud claim (count 8) against him are dismissed. It is denied in all other respects.

2. The motion of the Mark Stern Defendants to dismiss the amended complaint as to them (DI 32) is granted to the extent that the aiding and abetting fraudulent conveyance with intent to defraud claim (count 4) is dismissed. It is denied in all other respects.

3. The motion of the Other Defendants (DI 49) is granted to the extent that (1) the aiding and abetting fraudulent conveyance with intent to defraud claim (Count 4) is dismissed as to all of these defendants, and (2) all claims against defendants Shapiro and Neiderman are dismissed. The motion is denied in all other respects.

SO ORDERED.

## REPORT AND RECOMMENDATION

GABRIEL W. GORENSTEIN, United States Magistrate Judge.

Plaintiff Amusement Industry, Inc. ("Amusement") has sued defendants Midland Avenue Associates, LLC ("Midland"); Stephen Stern; Joshua Shapiro (a/k/a Joshua Schapiro a/k/a Joshua Schapira); Payless Office Products Corp. ("Payless"); Joseph Niederman; Kesef Properties, Inc. ("Kesef Properties"); Benjamin Irwin LLC ("Benjamin Irwin"); SME International Associates, Inc. (a/k/a SME International Associates a/k/a SME Associates a/k/a SME International) ("SME"); Moses Stern (a/k/a Mark Stern) ("Mark Stern"); First Republic Group Corp. ("FRG Corp."); Malke Malik, Tovia Malik, and Matthew Solof seeking damages arising out of the alleged misappropriation of funds belonging to Amusement that Amusement had deposited into escrow in July 2007. *See* Amended Complaint, filed Sept. 17, 2010 (Docket # 5) ("Compl.") ¶¶ 1–7. Stephen Stern, Mark Stern, FRG Corp., Midland, SME, Joshua Shapiro, Payless, Joseph Niederman, Kesef Properties, Malke Malik, and Tovia Malik (collectively, the "defendants") have now moved to dismiss the claims against them. For the reasons stated below, Stephen Stern's motion to dismiss (Docket # 21); Mark Stern, FRG Corp., Midland, and SME's (collectively, the "Mark Stern Defendants") motion to dismiss (Docket # 32); and Joshua Shapiro, Payless, Joseph Niederman, Kesef Properties, Malke Malik, and Tovia Malik's motion to dismiss (Docket # 49) should each be granted in part and denied in part.

## I. BACKGROUND

### A. *Claims Brought by Amusement*

For purposes of deciding the instant motions, we assume the truth of the allega-

tions in the amended complaint, hereinafter referred to as the "complaint."

In April 2007, FRG Corp., controlled by Mark Stern, *id.* ¶ 2, entered into a contract to purchase eleven shopping centers (the "Portfolio") from Colonial Realty Limited Partnership ("Colonial") with a closing date of late June 2007, *id.* ¶¶ 2, 34.[1] First Republic Group LLC ("FRG LLC") was formed on or about June 23, 2007 to hold the Portfolio, and, at some point after this date, FRG Corp. "assigned [its] interest in the Colonial purchase agreement" to FRG LLC. *Id.* ¶ 2. As the date of closing approached, Mark Stern "sought from Amusement and others the additional funds needed to close the purchase of the Portfolio." *Id.* ¶¶ 2, 35. In reliance on various representations by Mark Stern and others as to, *inter alia*, "the appraised value of the Portfolio, the suitability of Mark Stern as a business partner, and the proposed use of Amusement's funds," Amusement entered into a "letter of understanding" ("LOU") with Mark Stern, who was acting on behalf of FRG Corp. and/or FRG LLC, on July 2, 2007. *Id.* ¶¶ 2, 37. Pursuant to the LOU, Amusement deposited $13 million into an escrow account located at North Fork Bank and maintained by Land Title Associates, an entity operated by Ephraim Frenkel. *Id.* ¶¶ 2, 38. The parties understood that these funds "would remain in escrow pending finalization of the terms for an agreement pursuant to which Amusement would obtain an ownership interest in the entity holding the Portfolio, security interests in the properties that comprised the Portfolio, and repayment of its funds." *Id.* ¶ 2; *see id.* ¶¶ 3, 39, 41, 46. Following the transfer of the money to escrow, Amuse-

ment made a number of proposals to finalize the terms of an agreement, but no agreement was ever reached. *Id.* ¶¶ 4, 40.

On or about July 3, 2007, without Amusement's knowledge or consent, Frenkel transferred the $13 million into a bank account belonging to FRG Corp. *Id.* ¶¶ 5, 45. The transfer "was made at the instruction of Mark Stern and Stephen Stern for the purpose of further removing the funds from Amusement's control." *Id.* ¶ 5. On or about July 12, 2007, Mark Stern directed that a portion of Amusement's funds be used to purchase the Portfolio. *Id.* ¶ 6. However, several million dollars of the $13 million placed into escrow by Amusement was not used for the purchase of the Portfolio. *Id.* ¶ 7. Mark Stern and Stephen Stern caused these funds to be diverted to defendants Stephen Stern, Midland, Shapiro, Payless, Niederman, Kesef Properties, SME, Mark Stern, Benjamin Irwin, "Malik," Solof, "Doe Defendants 1–10," and the "XYZ Corp." (collectively, the "transferees"). *Id.* ¶¶ 7, 45, 46.

Additionally, Mark Stern and Stephen Stern "created or assisted with the creation of or submission of false expenses in the Colonial transaction so that there would appear to be higher than actual expenses associated with the purchase of the Portfolio." *Id.* ¶ 47. Stephen Stern "devis[ed] a legal excuse for Mark Stern to delay closing the transaction with Colonial until Mark Stern could find a party to serve as a target from whom the funds could be obtained." *Id.* ¶ 161. The statements and omissions made by Mark Stern and Stephen Stern were "designed to induce Amusement to leave its $13 million in escrow with Frenkel and, after the money was misappropriated, to cause Amusement to believe that its money was still in escrow or being properly used for the Portfolio." *Id.* ¶ 156; *see id.* ¶¶ 157–58, 162–69.

---

1. While some of the parties' briefing cites to the original complaint, Amusement has since filed an amended complaint and thus we cite to that pleading.

Amusement wrote to Frenkel on several occasions, copying Mark Stern and Steven Friedman on the correspondence, to ask for the return of Amusements funds, but received no response. *Id.* ¶ 52. In a further attempt to evade Amusement's efforts to obtain return of the funds, Mark Stern and Stephen Stern transferred these funds to the bank accounts of Mark Stern's family, friends and close associates, including Stephen Stern, Stephen Stern's law firm, Hoffinger, Stern & Ross, a bank account titled in the name of "Malke Malik ATF Tovia Malik," and a bank account in the name of Bruce Minsky, an attorney representing Mark Stern. *Id.* ¶¶ 55–61. Between about July 16, 2007 and August 23, 2007, at the instruction of Mark Stern and others, Minsky transferred $636,649.25 of Amusement's funds into an account at JP Morgan Chase Bank in the name of Midland and for the benefit of Midland and/or Mark Stern. *Id.* ¶ 63. On or about July 18, 2007, at the instruction of Mark Stern and others, Minsky transferred $945,327.72 of Amusement's funds into an account at JP Morgan Chase Bank in the name of Payless and for the benefit of Payless and/or Shapiro. *Id.* ¶ 64. On or about August 20, 2007, at the instruction of Mark Stern and others, Minsky transferred $350,000 of Amusement's funds to an account at North Fork Bank in the name of Benjamin Irwin for the benefit of Benjamin Irwin and/or Niederman and/or Solof. *Id.* ¶ 66. On or about August 21, 2007, at the instruction of Mark Stern and others, Minsky transferred $120,000 of Amusement's funds to an account at Provident Savings Bank in the name of Kesef Properties for the benefit Niederman. *Id.* ¶ 67. Mark Stern had a close relationship with Payless, Kesef Properties, Niederman, Benjamin Irwin and Solof, and these transfers were made without regard to the adequacy of consideration. *Id.* ¶¶ 65, 68–69. Mark Stern also made these transfers

knowing that he would be able to retain the benefit and use of the funds as he and Payless, Niederman, and Solof had a "pattern of attempting to engage in such transfers in order to avoid business transactions, in an attempt to thwart creditors, and in an attempt to gain potential advantages from their adversaries within prior suits." *Id.* ¶ 68; *see id.* ¶¶ 65, 69–70. The transferees provided wire instructions for destination accounts for the funds taken from Amusement at a time when they "knew that by receiving a transfer of Amusement's funds, Mark Stern was intentionally defrauding Amusement," *id.* ¶ 115, and that they had no right to payment from either FRG Corp. or Land Title Associates. *Id.* ¶¶ 115–19.

Mark Stern and Stephen Stern were aware that Amusement had agreed to allow its funds to be used only to pay expenses in connection with the purchase of the Portfolio, and not for the satisfaction of other debts or for any other purpose. *Id.* ¶¶ 56, 62, 96, 105. However, neither Minsky nor any of the defendants to whom Amusement's funds were transferred "had any legitimate connection to the Portfolio purchase," although "each recipient of funds had a close relationship with Mark Stern." *Id.* ¶ 71.

On July 13, 2007 and August 8, 2007, Frenkel transferred a total of $6,387,047.62 of Amusement's funds into a Wachovia Bank account designated to hold reserve funds related to the Portfolio loan. *Id.* ¶¶ 72–73. On or about September 13, 2007, $1,050,00.00 was transferred out of the Wachovia Bank account to a Citizen's Bank account titled in the name of FRG Corp., controlled by Mark Stern. *Id.* ¶ 75. This $1,050,00.00 consisted of Amusement's funds which had originally been transferred from the escrow account at North Fork Bank. *Id.* ¶ 76. "[D]uring September 2007 and thereafter, on-line transfers were made between [this] Citi-

zens Bank [a]ccount ... and various other accounts in the name of FRG Corp. and SME ...." *Id.* ¶ 77. At least some of these funds were Amusement's funds and these transfers were made "to further obscure the location of the funds and the existence of the transfers." *Id.* ¶¶ 78–79. After the transfers, Mark Stern and the entities which he owned and controlled "were either rendered insolvent or in possession of an unreasonably small amount of capital to repay" Amusement's funds taken from escrow without Amusement's permission. *Id.* ¶¶ 85–86, 99.

Amusement makes claims against all of the defendants for constructive fraudulent conveyance pursuant to N.Y. Debt. & Cred. Law §§ 273, 274, 275, *id.* ¶¶ 81–90; fraudulent conveyance with intent to defraud pursuant to N.Y. Debt. & Cred. Law § 276, *id.* ¶¶ 91–103; aiding and abetting fraudulent conveyance with intent to defraud, *id.* ¶¶ 113–23; conversion, *id.* ¶¶ 124–37; aiding and abetting conversion, *id.* ¶¶ 138–44; and unjust enrichment, *id.*

¶¶ 145–54. Amusement also makes claims against Stephen Stern alone for aiding and abetting a fraudulent conveyance by an insolvent, *id.* ¶¶ 104–112; and aiding and abetting fraud, *id.* ¶¶ 155–69.

### B. *The Instant Motions*

Stephen Stern, the Mark Stern Defendants, Shapiro, Payless, Niederman, Kesef Properties, Malke Malik, and Tovia Malik have filed motions to dismiss. On November 11, 2010, Stephen Stern filed a motion to dismiss pursuant to New York Judiciary Law § 470 and Rules 12(b)(1), 12(b)(6), and 9(b) of the Federal Rules of Civil Procedure.[2] On December 13, 2010, the Mark Stern Defendants filed a motion to dismiss on the same grounds.[3] On January 21, 2011, Joshua Shapiro, Payless, Joseph Niederman, Kesef Properties, Malke Malik, and Tovia Malik moved to dismiss the complaint pursuant to Rules 9(b), 12(b)(6), and 17(a) of the Federal Rules of Civil Procedure, Article III, § 2 of the U.S. Constitution, and 28 U.S.C. 1332(a).[4] All three motions are discussed herein.

---

**2.** *See* Notice of Motion to Dismiss Amended Complaint, filed Nov. 11, 2010 (Docket # 21); Declaration of Mark W. Geisler in Support of Motion to Dismiss Amended Complaint, filed Nov. 11, 2010 (Docket # 22); Memorandum of Law in Support of Motion to Dismiss the Amended Complaint Against Stephen Stern, filed Nov. 11, 2010 (Docket # 23) ("Stern Mem."); Opposition to Motion to Dismiss, filed Dec. 13, 2010 (Docket # 35) ("# 21 Opp."); Declaration of Allen P. Sragow in Opposition to Stephen Stern Motion to Dismiss, filed Dec. 13, 2010 (Docket # 36); Reply Declaration of Mark W. Geisler in Further Support of Motion to Dismiss Amended Complaint, filed Jan. 7, 2011 (Docket # 41); Reply Memorandum of Law in Further Support of Motion to Dismiss the Amended Complaint Against Stephen Stern, filed Jan., 7, 2011 (Docket # 42) ("Stern Reply").

**3.** *See* Notice of Motion to Dismiss Amended Complaint, filed Dec. 13, 2010 (Docket # 32) ("Notice of # 32 Motion"); Declaration of Mark W. Geisler in Support of Motion to Dismiss Amended Complaint, filed Dec. 13,

2010 (Docket # 33); Memorandum of Law in Support of Motion to Dismiss the Amended Complaint Against Midland Avenue Associates, LLC, SME International, Inc., Mark Stern and First Republic Group Corp., filed Dec. 13, 2010 (Docket # 34) ("Midland Mem."); Opposition to Motion to Dismiss, filed Jan. 13, 2011 (Docket # 44) ("# 32 Opp."); Declaration of Allen P. Sragow in Opposition to Defendants Mark Stern, FRG Corp., Midland Avenue Associates and SME's Motion to Dismiss, filed Jan. 13, 2011 (Docket # 45); Reply Declaration of Mark W. Geisler in Further Support of Motion to Dismiss Amended Complaint, filed Feb. 3, 2011 (Docket # 53); Reply Memorandum of Law in Further Support of Motion to Dismiss the Amended Complaint Against Midland Avenue Associates, LLC, SME International, Inc., Mark Stern and First Republic Group Corp., filed Feb. 3, 2011 (Docket # 54) ("Midland Reply").

**4.** *See* Notice of Motion, filed Jan. 21, 2011 (Docket # 49); Memorandum of Law in Sup-

## II. *LAW GOVERNING MOTIONS TO DISMISS*

A party may move to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) where the opposing party's complaint "fail[s] to state a claim upon which relief can be granted . . . ." While a court must accept as true all of the allegations contained in a complaint, that principle does not apply to legal conclusions. *See Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949–50, 173 L.Ed.2d 868 (2009); *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) ("a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do") (citation, internal quotation marks, and brackets omitted). In other words, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," *Iqbal,* 129 S.Ct. at 1949, and thus a court's first task is to disregard any conclusory statements in a complaint, *id.* at 1949–50.

Next, a court must determine if the complaint contains "sufficient factual matter" which, if accepted as true, states a claim that is "plausible on its face." *Id.* at 1949 (citation and internal quotation marks omitted); *accord Port Dock & Stone Corp. v. Oldcastle Ne., Inc.,* 507 F.3d 117, 121 (2d Cir.2007) ("a complaint must allege facts that are not merely consistent with the conclusion that the defendant violated the law, but which actively and plausibly suggest that conclusion"). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal,* 129 S.Ct. at 1949 (citations and internal quotation marks omitted). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," a complaint is insufficient under Fed.R.Civ.P. 8(a) because it has merely "alleged" but not " 'show[n] . . . that the pleader is entitled to relief.' " *Id.* at 1950 (quoting Fed.R.Civ.P. 8(a)(2)).

## III. *DISCUSSION*

■ While the claims in this case arise under state law, no party has briefed the issue of choice of law. Because all parties have relied on New York State law in their memoranda of law, they have implicitly consented to the application of New York law. This " 'implied consent . . . is sufficient to establish choice of law.' " *Krumme v. WestPoint Stevens Inc.,* 238 F.3d 133, 138 (2d Cir.2000) (quoting *Tehran–Berkeley Civil & Envtl. Eng'rs v. Tippetts–Abbett–McCarthy–Stratton,* 888 F.2d 239, 242 (2d Cir.1989)).

We now address each of the grounds for dismissal raised by the defendants.

### A. *Standing*

■ All of the defendants argue that this Court does not have jurisdiction over Amusement's claims because Amusement lacks standing to prosecute this action. *See* Stern Mem. at 23–29; Stern Reply at 20–26; Midland Mem. at 16–23; Midland Reply at 14–19; Shapiro Mem. at 5–7;

port of Defendants Joshua Shapiro, Payless Office Products Corp., Joseph Niederman, Kesef Properties Inc., Malke Malik, Tovia Malik's Motion to Dismiss Plaintiff's Amended Complaint, filed Jan. 21, 2011 (Docket # 50) ("Shapiro Mem."); Opposition to Motion to Dismiss, filed Feb. 2, 2011 (Docket # 60);

Memorandum of Law in Further Support of Defendants Joshua Shapiro, Payless Office Products Corp., Joseph Niederman, Kesef Properties Inc., Malke Malik, Tovia Malik's Motion to Dismiss Plaintiff's Amended Complaint, filed Mar. 23, 2011 (Docket # 66) ("Shapiro Reply").

Shapiro Reply at 4–8. "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir.2000) (citing Fed.R.Civ.P. 12(b)(1)). Under Article III of the Constitution, federal courts have jurisdiction only over "[c]ases" and "[c]ontroversies." U.S. Const. art. III, § 2, cl. 1. Thus, "[i]f plaintiffs lack Article III standing, a court has no subject matter jurisdiction to hear their claim." *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck–Medco Managed Care, L.L.C.*, 433 F.3d 181, 198 (2d Cir.2005); *accord Altman v. Bedford Cent. Sch. Dist.*, 245 F.3d 49, 69 (2d Cir.) ("The Constitution limits the jurisdiction of Article III courts to matters that present actual cases or controversies. This limitation means that when a plaintiff brings suit in federal court, she must have standing to pursue the asserted claims.") (internal citation omitted), *cert. denied*, 534 U.S. 827, 122 S.Ct. 68, 151 L.Ed.2d 34 (2001).

■ To meet the Article III standing requirement,

a plaintiff must show [1] that he "suffered an injury-in-fact-an invasion of a legally protected interest which is (a) concrete and particularized ... and (b) actual or imminent, not conjectural or hypothetical"; [2] that there was a "causal connection between the injury and the conduct complained of"; and [3] that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, [561], 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (citations and internal quotation marks omitted). "[E]ach element [of standing] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence

required at the successive stages of the litigation." *Id.* at 561, 112 S.Ct. 2130. *Carver v. City of New York*, 621 F.3d 221, 225 (2d Cir.2010).

■ The defendants argue that Amusement lacks standing because it has assigned all of its interest in certain promissory notes that were created as a result of the Portfolio transaction to an entity called Practical Finance Co., Inc. ("Practical"), which is not a party to this action. The existence of these notes are, however, nowhere mentioned in the complaint. Accordingly, defendants argue that, in deciding the standing issue, this Court should look to the allegations in Amusement's third amended complaint filed in *Amusement Indus., Inc. v. Stern*, No. 07–CV–11586 (Docket # 405) ("TAC"), the original action against Mark Stern and others involved in the Colonial transaction, and should look to the notes themselves, which defendants have put into the record in this action. *See* Stern Reply at 10–17, 22–23, 25–26; Midland Reply at 7–13, 15, 18; Shapiro Reply at 4–8. The defendants correctly note that a court is "free to consider materials extrinsic to the complaint" in deciding a motion to dismiss for lack of subject matter jurisdiction, *see, e.g., Moser v. Pollin*, 294 F.3d 335, 339 (2d Cir.2002).

In the TAC, Amusement alleged that the defendants in that action closed the purchase of the Portfolio, without Amusement's permission, using the $13 million Amusement had placed into escrow. *See* TAC ¶¶ 2, 4. Amusement also alleged that, "[i]n an apparent effort to induce Amusement to ratify the use of its funds without knowing it, Defendants delivered," among other documents, "a $13 million promissory note executed by Stern and due in 60 days, a $15 million promissory note executed by Stern and due in 60 days, and an escrow agreement executed by Stern placing these items in escrow." *Id.* ¶ 4.

Amusement alleged that it "did not accept these documents and terms for the use of its $13 million." *Id.* ¶ 4. Elsewhere in the complaint, it alleged that "Practical [wa]s the assignee of Amusement's interests *in the promissory notes signed by Stern.*" *Id.* ¶ 7 (emphasis added); *see id.* ¶¶ 48, 50. The assignments at issue, which are dated November 15, 2007, provide: "Payee [that is, Amusement] does hereby irrevocably, absolutely and unconditionally transfer, sell, assign, pledge and convey to Assignee [that is, Practical], its successors and assigns, all of the right, title and interest of Payee in and to: the Note." Assignments of Promissory Notes (annexed as Ex. I to Notice of # 32 Motion). The assignments are signed by a representative of Amusement. *Id.*

These assignments do not deprive this Court of subject matter jurisdiction over the complaint, however, because Amusement does not seek to recover amounts due to Practical under these two promissory notes.[5] Rather, it seeks recovery of a portion of the $13 million that Amusement deposited into escrow and that was subsequently diverted, without Amusement's consent, to defendants. Contrary to defendants' assertions, *see* Stern Mem. at 23–27; Stern Reply at 23–26; Midland Mem. at 16–21; Midland Reply at 16; Shapiro Mem. at 6–7, the TAC does not allege that these funds were secured by the promissory notes, that Amusement assigned its right to anything other than to payment under these notes, or that Amusement received payment on either of the notes. Rather, the TAC alleges only that these notes were executed by certain defendants in order to "induce Amusement to ratify the use of its funds." TAC ¶ 4. Thus, the treatment of these notes is irrelevant to the allegations of the instant lawsuit.

■ Stephen Stern and the Mark Stern Defendants also assert that Amusement does not have standing because Amusement has failed to allege causation or redressability pursuant to Article III, § 2 of the United States Constitution. These defendants argue that "[t]here is not a 'fairly traceable' connection between the alleged injury in fact and Movants' alleged conduct," Stern Mem. at 28, and that "there is nothing to redress" as Amusement has suffered no injury, Midland Mem. at 21. *See* Stern Mem. at 27–29; Midland Mem. at 21–22. This argument is rejected. Amusement alleges that the defendants improperly transferred and/or received Amusement's money, thus showing a causal connection between the defendants' actions and the injury Amusement claims, and that the complaint seeks a money judgment against the defendants, which will obviously redress the injury Amusement suffered a result of losing its money. Thus, Amusement has standing to bring this action.

B. *Section 470 of the New York Judiciary Law*

Stephen Stern and the Mark Stern Defendants argue that this action must be dismissed because there has been a violation of section 470 of the New York Judiciary Law. *See* Stern Mem. at 21–22; Stern Reply at 49–52, Midland Mem. at 14–16; Midland Reply at 3–7. Section 470 of the New York Judiciary Law provides: "A person, regularly admitted to practice as an attorney and counsellor, in the courts of record of this state, whose office for the transaction of law business is within the state, may practice as such attorney or counsellor, although he resides in an adjoining state." N.Y. Jud. Law § 470. Defendants argue that because Allen P.

---

**5.** Indeed, we held in *Amusement Indus., Inc. v. Stern,* 786 F.Supp.2d 758 (S.D.N.Y.2011), that Amusement had not stated a claim for breach of the promissory notes.

Sragow, Amusement's attorney, does not have an office in New York, this case must be dismissed.

 This argument is rejected. "[N]early a century of Supreme Court precedent" has established that "practice before federal courts is not governed by state court rules." *Brown v. Smith (In re Poole)*, 222 F.3d 618, 622 (9th Cir.2000); *see Surrick v. Killion*, 449 F.3d 520, 531 (3d Cir.2006); *Rittenhouse v. Delta Home Improvement, Inc. (In re Desilets)*, 291 F.3d 925, 928 (6th Cir.2002). "Admission to practice law before a state's courts and admission to practice before the federal courts in that state are separate, independent privileges." *In re Poole*, 222 F.3d at 620. Thus, this Court's rules, rather than the New York Judiciary Law, govern this action. Defendants' citation to numerous New York State cases in support of their argument, *see* Stern Mem. at 21–22; Midland Mem. at 14–15, is thus irrelevant as none of these cases deal with practice in federal courts. Inasmuch as Sragow is admitted to the bar of this Court, *see* Stern Reply at 51; Midland Reply at 5, there is no bar to Sragow appearing in this action.

## C. *Duplicative Litigation*

 "As part of its general power to administer its docket, a district court may stay or dismiss a suit that is duplicative of another federal court suit." *Curtis v. Citibank, N.A.*, 226 F.3d 133, 138 (2d Cir.2000) (citing *Col. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976) ("As between federal district courts, ... though no precise rule has evolved, the general principle is to avoid duplicative litigation.")). "The complex problems that can arise from multiple federal filings do not lend themselves to a rigid test, but require instead that the district court consider the equities of the situation when

exercising its discretion." *Curtis*, 226 F.3d at 138. An action is duplicative "if the claims, parties, and available relief do not significantly differ between the two actions." *N. Assurance Co. of Am. v. Square D Co.*, 201 F.3d 84, 89 (2d Cir. 2000) (internal quotation marks and citation omitted).

 Defendants Mark Stern and FRG Corp. argue that the complaint must be dismissed against them because Amusement has already sued them based on the same alleged conduct in the 2007 case. *See* Midland Mem. at 24–26; Midland Reply at 19–21. Both the TAC (the governing pleading in the 2007 case) and the amended complaint in the instant action allege conversion, unjust enrichment and fraud-based claims, and both these complaints relate ultimately to the loss of Amusement's funds. However, the TAC is based on the defendants' efforts to induce Amusement to place its $13 million into escrow for the purchase of the Portfolio and the defendants' improper refusal to return this money. The complaint in the instant action, by contrast, is brought against a largely different set of defendants and is based on the diversion of Amusement's funds—after it was taken by Mark Stern and FRG Corp.—to the defendants in this action for uses unrelated to the acquisition of the Portfolio. *See* Compl. ¶¶ 7, 45–50, 128, 130, 133. In other words, the claims in the TAC are based on the improper refusal to return Amusement's $13 million from escrow, whereas the claims in the instant action are based on the subsequent transfers of a portion of this money. While there is a "rough resemblance between the two suits," they are not so duplicative that the Court should exercise its discretion to stay or dismiss this action. *Curtis*, 226 F.3d at 136 ("A court must be careful, when dismissing a second suit between the same

parties as duplicative, not to be swayed by a rough resemblance between the two suits without assuring itself that beyond the resemblance already noted, the claims asserted in both suits are also the same.")

### D. Subject Matter Jurisdiction Over the Claims Against Malke Malik and Tovia Malik

Defendants Malke Malik and Tovia Malik (the "Malik Defendants") move for dismissal of the claims against them on the ground that they do not meet the $75,000 jurisdictional threshold for a diversity case under 28 U.S.C. § 1332. *See* Shapiro Mem. at 7–9; Shapiro Reply at 8–14. The Malik Defendants note that the complaint alleges that they received a check for only $50,000, and argue that Amusement has therefore "fail[ed] to meet the amount in controversy requirement necessary to establish diversity jurisdiction." Shapiro Mem. at 7–8.

The complaint alleges, however, that the Malik Defendants aided and abetted the conversion of Amusement's funds. *See* Compl. ¶¶ 138–44. The Malik Defendants have not sought to dismiss this count. It is settled that "those who aid and abet or conspire in tortious conduct are jointly and severally liable with other participants in the tortious conduct." *Lumbard v. Maglia, Inc.*, 621 F.Supp. 1529, 1536 (S.D.N.Y.1985) (citations omitted); *In re WorldCom, Inc. Sec. Litig.*, 2005 WL 613107, at *6 (S.D.N.Y. Mar. 15, 2005) ("Under joint and several liability, when two or more persons' torts together cause an injury, each tortfeasor is liable to the victim for the total damages. Under this doctrine, a tortfeasor is not relieved of liability for the entire harm he caused just because another's negligence was also a factor in effecting the injury.") (internal quotation marks and citations omitted). If proven, the Malik Defendants would potentially be liable to the full extent of the conversion, which Amusement alleges exceeds $2 million, *see* Compl. ¶ 102. Thus, the jurisdictional threshold is met.

### E. Constructive Fraudulent Conveyance (Count 1 ¶¶ 81–90)

#### 1. Legal Principles

Under New York law, "[e]very conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration." N.Y. Debt. & Cred. Law § 273. New York law broadly defines "creditor" to include any person "having any claim, whether matured or unmatured, liquidated or unliquidated, absolute, fixed or contingent." *Id.* § 270; *see Shelly v. Doe*, 249 A.D.2d 756, 757, 671 N.Y.S.2d 803 (3d Dep't 1998) ("in tort cases the relationship of debtor and creditor arises the moment the cause of action accrues").

To restate the terms of N.Y. Debt. & Cred. Law § 273: "if a conveyance is made without fair consideration and the transferor is a debtor who is insolvent or will be rendered insolvent by the transfer, the conveyance is deemed constructively fraudulent." *Capital Distributions Servs., Ltd. v. Ducor Express Airlines, Inc.*, 440 F.Supp.2d 195, 203 (E.D.N.Y.2006) (citing N.Y. Debt. & Cred. Law § 273); *accord Murin v. Estate of Schwalen*, 31 A.D.3d 1031, 1032, 819 N.Y.S.2d 341 (3d Dep't 2006) ("both insolvency and lack of fair consideration are prerequisites to a finding of constructive fraud under [§ 273]") (internal quotation marks and citation omitted). Parallel statutes render a transfer without fair consideration fraudulent where the debtor is left with unreasonably small capital for a pending or imminent business transaction, *see* N.Y. Debt. & Cred. Law § 274; or the

debtor intends or believes that he will incur debts beyond his ability to pay them as they mature, *see id.* § 275. *See Liberty Mut. Ins. Co. v. Horizon Bus Co.*, 2011 WL 1131098, at *5 (E.D.N.Y. Feb. 22, 2011); *In re Singh*, 434 B.R. 298, 309 (Bankr.E.D.N.Y.2010).

 Under N.Y. Debt. & Cred. Law § 272(a), which applies to all the constructive fraudulent conveyance statutes, "[f]air consideration is given for property, or obligation ... [w]hen in exchange for such property, or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied."[6] As the language of § 272(a) indicates, " 'fair consideration' has two components. These are the fair equivalency of the consideration given and good faith." *In re Cambridge Capital, LLC.*, 331 B.R. 47, 63 (Bankr.E.D.N.Y.2005). "The good faith of both the transferor and the transferee is regarded as an 'indispensable component' of fair consideration." *Fane v. Howard*, 13 A.D.3d 950, 952, 788 N.Y.S.2d 432 (3d Dep't 2004) (citations omitted).[7] Lack of good faith may be shown by demonstrating that any one of the following factors is lacking: "(1) an honest belief in the propriety of the activities in question; (2) no intent to take unconscionable advantage of others; and (3) no intent to, or knowledge of the fact that the activities in question will hinder, delay, or defraud others." *Southern Indus. v. Jeremias*, 66 A.D.2d 178, 183, 411 N.Y.S.2d 945 (2d Dep't 1978).

 Where a plaintiff meets its burden of showing that the transfer is made without consideration, there exists "a presumption of insolvency that shifts the burden to the defendant to rebut by showing continued solvency after the transaction." *RTC Mortg. Trust 1995–S/N1 v. Sopher*, 171 F.Supp.2d 192, 199 (S.D.N.Y.2001) (citations omitted); *accord Fed. Nat'l Mortg. Ass'n v. Olympia Mortg. Corp.*, 2011 WL 2414685, at *9 (E.D.N.Y. June 08, 2011) ("The law ... shifts the burden of proof for insolvency *to* the transferee when there was no fair consideration in exchange for the conveyance.") (emphasis in original).

 "A fraudulent conveyance claim seeking to recover money damages can only be maintained against a person who participates in the fraudulent transfer as either the transferee of the assets or the beneficiary of the conveyance." *Fundacion Presidente Allende v. Banco de Chile*, 2006 WL 2796793, at *3 (S.D.N.Y. May 29, 2006) (citations omitted); *accord Stochastic Decisions, Inc. v. DiDomenico*, 995 F.2d 1158, 1172 (2d Cir.), *cert. denied*, 510 U.S. 945, 114 S.Ct. 385, 126 L.Ed.2d 334 (1993); *In re Shore to Shore Realty Inc.*, 2011 WL 350526, at *5 (E.D.N.Y. Feb. 1, 2011); *Sullivan v. Kodsi*, 373 F.Supp.2d 302, 309 (S.D.N.Y.2005); *RTC Mortg. Trust 1995–S/N1*, 171 F.Supp.2d at 201. Thus, the transferor of the property—that is, the debtor—is not the proper defendant in a fraudulent conveyance claim. Nor may a claim be brought against parties who merely participated in the transfer but did not benefit from it. *See, e.g., Brenner v. Philips, Appel & Walden, Inc.*, 1997 WL 33471053, at *5 (S.D.N.Y. July 22, 1997).

---

6. Fair consideration is also deemed to be given in exchange for property or an obligation "[w]hen such property, or obligation is received in good faith to secure a present advance or antecedent debt in amount not disproportionately small as compared with the value of the property, or obligation obtained." N.Y. Debt. & Cred. Law § 272(b).

7. The Second Circuit has stated without citation that "[t]he 'good faith' in § 272 is the good faith of the transferee," *HBE Leasing Corp. v. Frank*, 61 F.3d 1054, 1059 n. 5 (2d Cir.1995), without mentioning the good faith of the transferor.

██ "Generally, the creditor's remedy in a fraudulent conveyance action is limited to reaching the property which would have been available to satisfy the judgment had there been no conveyance. However, where the assets fraudulently transferred no longer exist or are no longer in the possession of the transferee, a money judgment may be entered against the transferee in an amount up to the value of the fraudulently transferred assets." *Capital Distributions Servs., Ltd.,* 440 F.Supp.2d at 204 (citations omitted); *accord In re Adelphia Recovery Trust,* 634 F.3d 678, 692–93 (2d Cir.2011); *Mfrs. & Traders Trust Co. v. Lauer's Furniture Acquisition, Inc.,* 226 A.D.2d 1056, 1057, 641 N.Y.S.2d 947 (4th Dep't 1996) ("money judgment was properly granted" where assets were "sold and commingled"). A transferee's liability is limited to a judgment in the amount of monies "wrongfully received," regardless of the total amount of the conveyance. *Farm Stores v. Sch. Feeding Corp.,* 102 A.D.2d 249, 256, 477 N.Y.S.2d 374 (2d Dep't 1984); *accord Liberty Mut. Ins. Co.,* 2011 WL 1131098, at *8.

### 2. *Claim Against Stephen Stern*

Stephen Stern argues that Amusement has failed to state a claim for constructive fraudulent conveyance against him because "Plaintiff ... admits [that Stephen Stern] and his firm were counsel to Mark Stern/FRG Corp. and FRG LLC and provided legal services thereto." Stern Mem. at 31. Noting that payment for fees would constitute payment for an antecedent debt, Stern argues fair consideration existed for the transfer. *Id.*

██ The complaint does little to allege with specificity that any money paid to Stephen Stern was without fair consideration. The complaint at one point states, without elaboration, that a $150,000 payment to Stern was a "fake expense[ ]."

Compl. ¶ 48. But later in the complaint, Amusement gives further detail regarding why the expense was fake, stating in substance that $50,000 of the $150,000 sum due to Stern's firm (because the firm was "purportedly entitled to fees") was diverted by Mark Stern to "Malik." *Id.* ¶ 101. The unmistakable implication of this statement is that Stern and his firm were entitled to the remaining $100,000 that they presumably received. *Id.* There is no factual explanation as why its entitlement to fees was "purported[ ]." Thus, the allegations are insufficient to allege that the payment to Stern was not for an antecedent debt.

Amusement makes the additional argument that, in any event, it has shown that there was a lack of good faith in the transfer. *See* # 21 Opp. at 11–12. As previously noted, a plaintiff seeking to set aside a fraudulent conveyance can satisfy the absence of fair consideration element by showing that the transfer was not made in good faith. *See* N.Y. Debt. & Cred. Law § 272(a). While plaintiff points to a swirl of allegations in the complaint reflecting that Stephen Stern was complicit in certain improper activities by Mark Stern and the FRG entities with respect to the receipt of plaintiff's moneys and the disbursement to other parties, *see, e.g.,* Compl. ¶¶ 46–51, 55–63, 75, 77, 96, nothing in the complaint alleges that there was any lack of good faith *with respect to the particular payment sought to be set aside:* that is, the moneys retained by Stephen Stern or his firm, apparently in the amount of $100,000. In other words, there is nothing in the complaint—other than general allegations regarding the lack of propriety in the carrying out of the transaction—to suggest an absence of a good faith belief by either Mark Stern or Stephen Stern that Stephen Stern or his firm was not entitled to the $100,000 payment. Accordingly, the claim of constructive

fraudulent conveyance against Stephen Stern must be dismissed.

### 3. *The Mark Stern Defendants' Arguments*

The Mark Stern Defendants argue that the claim should be dismissed against them principally because the allegations that they were insolvent/rendered insolvent by the transfers, or left with unreasonably small capital are "self-contradictory" and conclusory. *See* Midland Mem. at 26–27. In other words, the Mark Stern Defendants do not challenge the allegations insofar as they relate to the other elements of the fraudulent conveyance claim: that is, the showing that Amusement was a creditor, the transferor was a debtor, there was no fair equivalency of consideration, and the lack of good faith by the transferor and the transferee. Because we ignore the arguments that are made for the first time in the Mark Stern Defendants' reply brief, Midland Reply at 21–26, *see, e.g., Schuh v. Druckman & Sinel, L.L.P.*, 602 F.Supp.2d 454, 465 n. 7 (S.D.N.Y.2009), we address only the insolvency/small capital question.

The complaint as to fraudulent conveyance is certainly difficult to follow in many respects. For example, it asserts that Amusement is challenging "at least $2,151,976.97" worth of transfers, but does not specify which particular transfers add up to this amount. *See* Compl. ¶ 84. Focusing exclusively on the issue raised by the Mark Stern Defendants, the Court cannot conclude that the complaint fails to state a claim. The Mark Stern Defendants' central argument is that there has been no showing of insolvency/small capital because the complaint alleges that Mark Stern and/or his entities both controlled the transfers and were the beneficiaries of the improper transfers. The Mark Stern Defendants argue that, as a result, there could not have been any insolvency incurred by the transfers because any outgoing transfer of funds would have been "zero[ed]" out by the subsequent receipt of funds by one of the Mark Stern Defendants' entities. *See* Midland Mem. at 26 (internal quotation marks omitted); *id.* at 26–27.

The Mark Stern Defendants cite no case law at all to support this argument. Nor does the Court understand why it should provide a basis for dismissing the constructive fraudulent conveyance claim. To the extent that any transfers are from Mark Stern or a Mark Stern-controlled entity to another Mark Stern-controlled entity, the case law interpreting the fraudulent conveyance statute does not deem a transfer outside of the statutes simply based on common ownership and control by one of the entities involved in a transfer. All that is logically required by the constructive fraudulent conveyance statutes is that the transfer be between two legally distinct entities. Indeed, it is wholly understandable why the statute would set aside conveyances between two entities controlled by the same person. After all, a person might very well wish to defraud a creditor by transferring money to an entity which that person controls. It would be odd to disallow a set-aside of the transfer where the transferor had some beneficial interest in the transferee entity. To create such an exception is not only without warrant in case law, but would also defeat the very purpose of the fraudulent conveyance statute.

The Mark Stern Defendants' remaining argument is that there was not a " 'use of proceeds' restriction" on the funds provided by Amusement and that this is "a foundation · of Plaintiff's claims." Midland Mem. at 27. While it is unclear why such an allegation is critical to the fraudulent conveyance claim given Amusement's assertion that the defendants were not entitled to its money at all, the complaint in

fact alleges that the defendants knew that any funds provided by Amusement could only be used for the purchase of the Portfolio, *see* Compl. ¶¶ 61–62, and we are bound to accept the allegations of the complaint as true on this motion to dismiss.

F. *Intentional Fraudulent Conveyance (Count 2 ¶¶ 91–103)*

Both Stephen Stern and the Mark Stern Defendants argue that the intentional fraudulent conveyance claim should be dismissed against them for failure to plead fraud with particularity and because the specific allegations are either misstated or innocuous. *See* Stern Mem. at 32–35; Midland Mem. at 28–30.

N.Y. Debt. & Cred. Law § 276 provides: "Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors." *Id.* Unlike the constructive fraudulent conveyance statutes just discussed, "a cause of action [under § 276] may lie even where fair consideration was paid and where the debtor remains solvent." *Grumman Aerospace Corp. v. Rice,* 199 A.D.2d 365, 366, 605 N.Y.S.2d 305 (2d Dep't 1993) (citations omitted).

Case law recognizes that "fraudulent intent, by its very nature, is rarely susceptible to direct proof and must be established by inference from the circumstances surrounding the allegedly fraudulent act." *Marine Midland Bank v. Murkoff,* 120 A.D.2d 122, 128, 508 N.Y.S.2d 17 (2d Dep't 1986) (citations omitted).

Because direct proof of actual intent is rare, creditors may rely on " 'badges of fraud' " to establish an inference of fraudulent intent (*Pen Pak Corp. v. La Salle Nat'l Bank of Chicago,* 240 A.D.2d 384, 386 [658 N.Y.S.2d 407 (2d Dep't

1997) ] ). Factors that are considered "badges of fraud" are (1) a close relationship between the parties to the transaction, (2) a secret and hasty transfer not in the usual course of business, (3) inadequacy of consideration, (4) the transferor's knowledge of the creditor's claim and his or her inability to pay it, (5) the use of dummies or fictitious parties, and (6) retention of control of the property by the transferor after the conveyance (*see, MFS/Sun Life Trust–High Yield Series v. Van Dusen Airport Servs.* Co., 910 F.Supp. 913, 934 [ (S.D.N.Y.1995) ] ).

*Shelly v. Doe,* 249 A.D.2d 756, 758, 671 N.Y.S.2d 803 (3d Dep't 1998); *accord In re Sharp Int'l Corp.,* 403 F.3d 43, 56 (2d Cir.2005); *Lippe v. Bairnco Corp.,* 249 F.Supp.2d 357, 375 (S.D.N.Y.2003) (citations omitted), *aff'd,* 99 Fed.Appx. 274 (2d Cir.2004); *Dempster v. Overview Equities, Inc.,* 4 A.D.3d 495, 498, 773 N.Y.S.2d 71 (2d Dep't 2004). Such circumstances give rise to an inference of intent because they are "so commonly associated with fraudulent transfers." *Wall St. Assocs. v. Brodsky,* 257 A.D.2d 526, 529, 684 N.Y.S.2d 244 (1st Dep't 1999). Another possible indicator of fraud is "the general chronology of the events and transactions under inquiry." *In re Kaiser,* 722 F.2d 1574, 1582–83 (2d Cir.1983).

Rule 9(b) provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." *Id.* Because a claim under N.Y. Debt. & Cred. Law § 276 requires proof of intent to defraud, it must be pled with particularity as required by Fed.R.Civ.P. 9(b). *See Atlanta Shipping Corp., Inc. v. Chem. Bank,* 818 F.2d 240, 251 (2d Cir.1987); *accord Scantek Med., Inc. v. Sabella,* 583 F.Supp.2d 477, 497 (S.D.N.Y.2008). This requirement exists in order "to 'afford defen-

dant[s] fair notice of plaintiff's claim and the factual ground upon which it is based.' " *Mills v. Everest Reinsurance Co.*, 410 F.Supp.2d 243, 248 (S.D.N.Y.2006) (quoting *Ross v. Bolton,* 904 F.2d 819, 823 (2d Cir.1990)) (alteration in original); *see Liberty Mut. Ins. Co.,* 2011 WL 1131098, at *3. Courts have dismissed intentional fraudulent conveyance claims where the complaint did not provide particulars or "specify the property that was allegedly conveyed, the timing and frequency of those allegedly fraudulent conveyances, or the consideration paid." *United Feature Syndicate, Inc. v. Miller Features Syndicate, Inc.,* 216 F.Supp.2d 198, 221 (S.D.N.Y.2002) (citation omitted); *see also Liberty Mut. Ins. Co.,* 2011 WL 1131098, at *4 (dismissing actual fraud claim where "there are simply no allegations about what was conveyed and when it was conveyed"); *Waite v. Schoenbach,* 2010 WL 4456955, at *6 (S.D.N.Y. Oct. 29, 2010) (dismissing complaint that contained only conclusory allegations and no specific allegations regarding what was conveyed and when it was conveyed). Rule 9(b) also provides that "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed.R.Civ.P. 9(b). Thus, it is not necessary to plead the "badges of fraud" with particularity. *See, e.g., In re Tronox Inc.,* 429 B.R. 73, 94 (Bankr.S.D.N.Y.2010) (argument that "badges of fraud must be pled to satisfy Rule 9(b)" is a "flawed contention").

We first deal with the question of whether the claim should be dismissed for failure to plead fraud with particularity. The Mark Stern Defendants' argument on this point is brief. They argue that the allegations are "conclusory" and "peppered with 'upon information and belief'" allegations—but they fail to actually identify which allegations they are referring to. Midland Mem. at 29. They also argue that the complaint "intentionally misstates the facts," *id.* at 29, which is not a basis for granting a motion to dismiss for failure to state a claim.

The most specific argument made by the defendants is an attack on the allegation contained in paragraph 94, *see* Midland Mem. at 29, Stern Mem. at 33–34, which refers to the creation of false expenses in the closing statements of the Colonial transaction. But this allegation is not critical to the claim of an intentional fraudulent conveyance. The complaint contains numerous other allegations that reflect the "badges of fraud"—that is, allegations supporting the notion that the payments to Stephen Stern and the Mark Stern Defendants were made with the intent to thwart Amusement's ability to reclaim its money from them. The complaint contains allegations that there was a close relationship between Stern and the entities that received the funds, that the transfers were not performed as they would be in the usual course of business, that there was a lack of consideration for some of the transfers, that Mark Stern, Stephen Stern and others knew that Mark Stern was improperly using Amusement's money, and that Mark Stern used dummies or fictitious parties. *See, e.g.,* Compl. ¶¶ 55, 59, 65, 68, 69, 71, 99, 114. More specifically, the complaint alleges that Mark Stern and Stephen Stern intended to defraud Amusement by directing the escrow agent to release the escrowed funds and by directing Minsky to disburse the funds to the transferee defendants when they knew that the money was to be used only in connection with the Colonial transaction. *See id.* ¶¶ 46, 50, 56, 61–62, 96. It alleges that Stephen Stern and Mark Stern "created or assisted with the creation of or submission of false expenses in the Colonial transaction so that there would appear to be higher than actual expenses associated with the purchase of the Portfolio." *Id.* ¶ 47. And both Mark

Stern and Stephen Stern were specifically informed that Amusement's money could not be used without permission and could not, in any event, be used other than for Portfolio expenses. *Id.* ¶¶ 56, 61–62. Additionally, Amusement alleges that Mark Stern had a close relationship with the Malik Defendants, Payless, Kesef Properties, Niederman, Benjamin Irwin, and Solof, who received portions of Amusement's funds, based on the fact that these defendants were either friends, close associates, business partners, or family of Mark Stern. *See id.* ¶¶ 59, 65, 68, 69. Thus, Amusement has adequately relied on "badges of fraud" in alleging that the conveyances were made with actual intent "to hinder, delay, or defraud" Amusement. N.Y. Debt. & Cred. Law § 276. The complaint also alleges that Stephen Stern, Midland, FRG Corp. and SME were recipients of some of the transferred funds, *see* Compl. ¶¶ 57, 63, 75, 77, "a fact that in itself is enough to state a claim under [§ ]276, as such a claim may be based on defendant's receipt of fraudulently conveyed funds." *Dreieck Finanz AG v. Sun,* 1990 WL 11537, at *12 (S.D.N.Y. Feb. 9, 1990) (citations and footnote omitted).

Additionally, the complaint is clear as to the actual transfers it is attacking, going so far as to give names of parties to the transfers, the amounts of the transfers, the dates of the transfers, and even account numbers. *See* Compl. ¶¶ 57–78. This is sufficient to meet Rule 9(b)'s requirements. *See, e.g., Sullivan,* 373 F.Supp.2d at 306 (plaintiff satisfied Rule 9(b) pleading requirement where plaintiff "identified the approximate date of the transfer," "the interest involved," and "the party making the transfer . . . as well as the recipient").

Stephen Stern's additional arguments are (1) that the complaint misstates the facts, *see* Stern Mem. at 34–35, and (2) that there is no fraud as the payments to Stephen Stern were made directly to him,

rather than through a third party, *see* Stern Mem. at 35. As to the first argument, this is not a basis on which to move to dismiss for failure to state a claim. As to the second argument, the fact that Stephen Stern was paid directly—not to mention the allegation that the payments were for a pre-existing debt for provision of legal services, as discussed in section III. E.2 above—certainly weakens the indicia of fraud as to these payments. Nevertheless, the remaining allegations regarding the knowledge of the parties about the improper nature of the disbursements, just discussed, are sufficient to state a claim of intentional fraudulent conveyance.

Accordingly, Amusement's claim for intentional fraudulent conveyance should not be dismissed.

### G. *Aiding and Abetting a Constructive and Intentional Fraudulent Conveyance (Counts 3 and 4 ¶¶ 104–123)*

Plaintiffs assert claims of "aiding and abetting fraudulent conveyance by insolvent" against Stephen Stern and "aiding and abetting fraudulent conveyance with intent to defraud" against all defendants. Compl. ¶¶ 104–123. It is difficult to discern the practical purpose of these claims, however. As described at length in section III.E.1 above, the remedies provided under the fraudulent conveyance statutes allow for either setting aside the transfer or recovering money received by a transferee. Transferors cannot be sued for a fraudulent conveyance claim, and thus someone who has aided and abetted the transferor could not logically be sued either if they had no other role in the transaction. Of course, a transferee may be sued. But, for purposes of stating claims under the fraudulent conveyance statutes, it makes no difference whether the transferee also participated in the fraudulent

conveyance as long as the elements of a fraudulent conveyance claim are otherwise met.

◼ The factitious nature of a claim for "aiding and abetting a fraudulent conveyance" was recognized in *Atlanta Shipping Corp. v. Chem. Bank,* 631 F.Supp. 335, 348 (S.D.N.Y.1986), *aff'd,* 818 F.2d 240 (2d Cir.1987), in which the court noted:

> We do not believe it possible to state such a claim. In a fraudulent conveyance action, the plaintiff attacks the conveyance seeking to reclaim the property conveyed. 24 N.Y. Jur., Fraudulent Conveyances § 86 (1962). The appropriate relief is to void the conveyance. An aiding and abetting claim against someone other than a transferee is meaningless in these circumstances.

*Id.* More recent case law similarly recognizes as much. Thus, it has been held that " 'a creditor cannot seek monetary damages against a party on an aiding and abetting theory of fraudulent conveyance.' " *Chemtex, LLC v. St. Anthony Enters., Inc.,* 490 F.Supp.2d 536, 548 (S.D.N.Y.2007) (quoting *Fundacion Presidente Allende,* 2006 WL 2796793, at \*3) (additional citations omitted); *accord In re Magnesium Corp. of Am.,* 399 B.R. 722, 769–71 (Bankr.S.D.N.Y.2009). Although plaintiffs cite to cases involving aiding and abetting fraud, *see* # 21 Opp. at 19–25; # 32 Opp. at 18–19, they do not cite to any case that actually allowed a claim of aiding and abetting a fraudulent conveyance.

The case of *Fed. Deposit Ins. Co. v. Porco,* 75 N.Y.2d 840, 552 N.Y.S.2d 910, 552 N.E.2d 158 (1990), cited in Amusement's opposition papers, *see* # 21 Opp. at 25; # 32 Opp. at 18–19, specifically states that "the traditional rule in this State rejects any cause of action for mere participation in the transfer of a debtor's property prior to the creditor's obtaining a judgment or a lien on that property," *Porco,* 75 N.Y.2d at 842, 552 N.Y.S.2d 910, 552

N.E.2d 158 (citation omitted). Porco thus noted that, under the existing fraudulent conveyance statutes, the only possible claim for relief in such a circumstance would be a claim against "transferees of the assets [ ]or beneficiaries of the conveyance." *Id.; accord In re Parker,* 399 B.R. 577, 580 (Bankr.E.D.N.Y.2009) (citations omitted); *Chemtex, LLC,* 490 F.Supp.2d at 548. Another case cited by plaintiffs, *Stochastic Decisions, Inc.,* 995 F.2d at 1172, merely cited Porco to uphold a claim for fraudulent conveyance against an individual who actually received funds resulting from the allegedly fraudulent conveyance. *Stochastic Decisions, Inc.,* 995 F.2d at 1172. There is no reference in Stochastic Decisions, Inc. to any freestanding cause of action for "aiding and abetting" a fraudulent transfer. *Id.*

◼ As many of these cases note, a fraudulent conveyance claim may be brought against a defendant who assisted in the fraudulent conveyance where the defendant was itself a transferee of the assets or a beneficiary of the conveyance. But in such an instance, there is no need to resort to a claim of "aiding and abetting." Instead, such a defendant may be sued directly for the fraudulent conveyance, which is precisely what has happened here. *See generally Roselink Investors, LLC v. Shenkman,* 386 F.Supp.2d 209, 226–27 (S.D.N.Y.2004) ("New York law does not recognize 'a creditor's remedy for money damages against parties who, like defendants here, were neither transferees of the assets nor beneficiaries of the conveyance.' This is because '[t]he creditor's remedy in a fraudulent conveyance action is limited to reaching the property which would have been available to satisfy the judgment had there been no conveyance . . . .' Therefore, there can be no action for damages against a party who did not receive any of the property sought by the creditors.") (cita-

tions omitted) (alteration and omission in original). Accordingly, the claims for aiding and abetting a fraudulent conveyance asserted in counts three and four should be dismissed.

### H. Conversion (Count 5 ¶¶ 124–37)

Stephen Stern and the Mark Stern Defendants argue that Amusement has failed to state a claim for conversion against them. See Stern Mem. at 37–40; Stern Reply at 46–48; Midland Mem. at 31–33; Midland Reply at 29–30.

To state a claim for conversion under New York law, a plaintiff must show that "someone, intentionally and without authority, assume[d] or exercise[d] control over personal property belonging to someone else, interfering with that person's right of possession." *Colavito v. N.Y. Organ Donor Network, Inc.,* 8 N.Y.3d 43, 49–50, 827 N.Y.S.2d 96, 860 N.E.2d 713 (2006) (citation omitted). Put in other terms, a plaintiff must show (1) a "possessory right or interest in the property and (2) defendant's dominion over the property or interference with it, in derogation of plaintiff's rights." *Id.* at 50, 827 N.Y.S.2d 96, 860 N.E.2d 713 (citations omitted). Interference with a plaintiff's right to possession may be "by a wrongful: (I) taking; (ii) detention; or (iii) disposal." *Corporacion Fruticola De Chincha v. Watermelon Depot, Inc.,* 2008 WL 2986276, at *4 (S.D.N.Y. July 31, 2008) (citing *Pierpoint v. Hoyt,* 260 N.Y. 26, 29, 182 N.E. 235 (1932)). "Some affirmative act—asportation by the defendant or another person, denial of access to the rightful owner or assertion to the owner of a claim on the goods, sale or other commercial exploitation of the goods by the defendant—has always been an element of conversion." *State v. Seventh Regiment Fund, Inc.,* 98 N.Y.2d 249, 260, 746 N.Y.S.2d 637, 774 N.E.2d 702 (2002) (citations omitted).

Amusement's allegations meet all of these elements. Amusement entered into a letter of understanding with Mark Stern, on behalf of FRG Corp., on or about July 2, 2007, pursuant to which it placed $13 million into escrow. See Compl. ¶¶ 2–3, 37. Amusement did not give authority for the money to be released. See *id.* ¶¶ 3–4. Despite the lack of authority to use the money, Mark Stern and Stephen Stern directed that the funds be transferred into an account controlled by FRG Corp. See *id.* ¶¶ 5, 41, 45. Finally, Stephen Stern and Mark Stern, both individually and on behalf of Midland, FRG Corp., and SME, caused these funds to be disbursed to the transferee defendants, see *id.* ¶¶ 46, 56–58, 60, 63, 75–77, and the transferee defendants knew that they were receiving money rightfully belonging to Amusement, see, e.g., *id.* ¶¶ 105, 115, 149. In other words, Amusement had a possessory interest in its funds placed into escrow and the defendants intentionally obtained control of these funds without Amusement's permission. It is of no moment that, as Stephen Stern argues, Stern Mem. at 38, he only ended up keeping a fraction of the funds.

The Mark Stern Defendants argue that the $13 million was to be commingled with the rest of the funds needed to acquire the Portfolio, that it was not kept as a "separate, distinct, separately identifiable chattel and, therefore, [that it] cannot form the basis for a conversion claim." Stern Mem. at 39; Midland Mem. at 32. But as we discussed in *Amusement Indus., Inc.,* 786 F.Supp.2d 758, the two cases defendants cite for this proposition are not apposite. In *The High View Fund, L.P. v. Hall,* 27 F.Supp.2d 420 (S.D.N.Y.1998), the court dismissed a conversion claim brought by investors because the plaintiffs were simply seeking the return of money they had invested. *Id.* at 429. *Auguston v. Spry,* 282 A.D.2d 489, 723 N.Y.S.2d 103 (2d Dep't 2001), similarly involved an investor seek-

ing return of moneys invested. *Id.* at 489–91, 723 N.Y.S.2d 103. *Auguston* dismissed the conversion claim because plaintiff's $200,000 investment "was to be commingled into the [defendant] corporation's capital." *Id.* at 491, 723 N.Y.S.2d 103. Amusement contends that its funds were to remain undisturbed in the escrow account until some later time when an agreement would be reached as to its disposition. While that disposition might have eventually included commingling once release of the funds was authorized, Amusement does not contend that the release was ever authorized. Thus, it does not seek return of money paid towards an investment. Rather, it seeks the return of the specifically identified funds the plaintiffs placed in escrow, which were only to be released if Amusement gave defendants the authority to do so and which were subsequently diverted to Stephen Stern and the Mark Stern Defendants. *See* Compl. ¶¶ 3–315, 41, 45, 46, 56–58, 60, 63, 75–77.

Finally, these defendants argue that the transfer of funds constituted payment of legal fees and that Amusement authorized the release of the $13 million from escrow. *See* Stern Mem. at 38–40; Stern Reply at 46–47; Midland Mem. at 32–33; Midland Reply at 29–30. The fact that the funds were paid as legal fees because of an arrangement between Mark Stern and Stephen Stern, however, would not affect the allegation that no defendant was entitled to take possession of Amusement's money to begin with. As to the defendants' insistence that Amusement in fact authorized the release of its $13 million, this fact is not alleged in the complaint.

In sum, Amusement has stated a claim for conversion against Stephen Stern and the Mark Stern Defendants.

## I. *Aiding and Abetting Conversion (Count 6 ¶¶ 138–44)*

 Stephen Stern and the Mark Stern Defendants argue that the aiding and abetting conversion claim against them should be dismissed as defective and implausible. Stern Mem. at 40–42; Stern Reply at 46–48; Midland Mem. at 33–34; Midland Reply at 29–30. A claim for aiding and abetting conversion requires proof of (1) the existence of a primary violation, (2) knowledge of the violation by the aider and abettor; and (3) proof that the aider and abettor substantially assisted the primary wrongdoer. See *Lerner v. Fleet Bank, N.A.,* 459 F.3d 273, 292 (2d Cir. 2006); *IIT, an Int'l Inv. Trust v. Cornfeld,* 619 F.2d 909, 922 (2d Cir.1980); *Chemtex, LLC,* 490 F.Supp.2d at 546–48; *U.S. Bancorp Equip. Fin., Inc. v. Rubashkin,* 30 Misc.3d 1216(A), 2011 WL 293716 (Sup.Ct. 2011).

### 1. *Existence of Conversion*

 As discussed, Amusement has adequately alleged the existence of a primary violation. Amusement had a possessory interest in the funds placed in escrow and Stephen Stern and the Mark Stern Defendants, among others, took control of these funds without Amusement's permission. See Compl. ¶¶ 2–5, 37, 41, 45, 46, 56–58. 60, 63, 75–77.

### 2. *Actual Knowledge of the Conversion*

Amusement adequately alleges actual knowledge of the conversion on the part of Stephen Stern. The complaint alleges that Stephen Stern knew that Amusement had not agreed that its money would be used for anything other than the Colonial transaction. *See id.* ¶¶ 56, 61, 62, 105. Amusement also alleges that Stephen Stern knew that Minsky had been wrongfully directed to disburse the funds to the defendants as they had performed no services in connec-

tion with the Colonial transaction. *See id.* ¶¶ 46, 50, 56, 61–62, 96.

Amusement has additionally alleged actual knowledge of the conversion on the part of the Mark Stern Defendants. The complaint alleges that Mark Stern directed the escrow agent to release the escrowed funds and directed Minsky to disburse the funds to the transferee defendants, even though Mark Stern knew that the money was to be used only in connection with the Colonial transaction. *See id.* ¶¶ 46, 50, 61–62, 96. Amusement also alleges that Mark Stern created false expenses to make it more "difficult for Amusement to recover its money," *id.* ¶ 98, and that Mark Stern "designed this phony investment scheme as a method to divert funds from Amusement either" to himself and the entities he controlled, "or to investors or creditors to whom he alleged that he already owed money," *id.* ¶ 87. Finally, Amusement has alleged actual knowledge on the part of Midland, FRG Corp. and SME, inasmuch as these entities were solely owned and controlled by Mark Stern and, "[a]t all times relevant to the allegations set forth in the[ ] complaint, Mark Stern exercised complete and actual dominion over" them. *See id.* ¶¶ 10, 11, 18, 22. Based on this relationship with Mark Stern, these entities may be deemed to have actual knowledge that Amusement's funds were earmarked solely for the Portfolio purchase.

### 3. Substantial Assistance in the Conversion

■ A defendant provides substantial assistance only if he "affirmatively assists, helps conceal, or by virtue of failing to act when required to do so enables [the fraud] to proceed." *Diduck v. Kaszycki & Sons Contractors, Inc.,* 974 F.2d 270, 284 (2d Cir.1992) (citations omitted). Amusement has adequately alleged that Stephen Stern and the Mark Stern Defendants provided substantial assistance in the conversion of Amusement's funds. Amusement alleges that Stephen Stern provided wire instructions for the transfer of Amusement's funds, *see* Compl. ¶ 141, and the same allegation is made against Mark Stern, *see id.* Amusement also alleges that Mark Stern gave specific directions regarding the disbursement of funds to the transferee defendants, *see id.* ¶¶ 57, 59, 60, 63–64, 66–67, and created false expenses to further prevent Amusement from recovering its $13 million, *see id.* ¶¶ 94–95. Midland, FRG Corp. and SME provided wire instructions for destination accounts for the funds and received a portion of the transferred funds that they knew were earmarked solely for the Portfolio purchase. *See id.* ¶¶ 63, 77, 119.

\* \* \*

Accordingly, Amusement's claim for aiding and abetting conversion should not be dismissed.

### J. Unjust Enrichment (Count 7 ¶¶ 145–54)

All of the defendants argue that the unjust enrichment claim against them should be dismissed. *See* Stern Mem. at 42–43; Stern Reply at 49; Midland Mem. at 34–35; Midland Reply at 30–31; Shapiro Mem. at 14–15; Shapiro Reply at 15–16.

■ Under New York law, a plaintiff has stated a claim for unjust enrichment when it alleges "1) that the defendant benefitted; 2) at the plaintiff's expense; and 3) that equity and good conscience require restitution." *Kaye v. Grossman,* 202 F.3d 611, 616 (2d Cir. 2000) (internal quotation marks and citation omitted); *accord Paramount Film Distrib. Corp. v. State,* 30 N.Y.2d 415, 421, 334 N.Y.S.2d 388, 285 N.E.2d 695 (1972) ("The essential inquiry in any action for unjust enrichment or restitution is whether it is against equity and good conscience to permit the defendant to retain what is sought to be recovered.") (ci-

tations omitted). The "essence" of an unjust enrichment claim is that "one party has received money or a benefit at the expense of another." *Kaye*, 202 F.3d at 616 (internal quotation marks and citation omitted). Therefore, to support a claim for unjust enrichment, Amusement must allege that the defendants received money belonging to Amusement. *See, e.g., Granite Partners, L.P. v. Bear, Stearns & Co.*, 17 F.Supp.2d 275, 313 (S.D.N.Y. 1998) ("A defendant is enriched at the expense of a plaintiff when the defendant receives a benefit of money or property belonging to the plaintiff.") (citation omitted).

▮ Amusement has stated a claim against Stephen Stern, the Mark Stern Defendants, Shapiro, Payless, Niederman, Kesef Properties, and the Malik Defendants for unjust enrichment because it has alleged that these defendants received a benefit at the expense of Amusement when they improperly obtained possession of a portion of the $13 million that Amusement placed into escrow solely for use in connection with the purchase of the Colonial transaction, *see* Compl. ¶¶ 56–71, 75–78, and that these defendants knew that they were being given Amusement's money, *see id.* ¶¶ 56, 59, 61, 65, 68–70, 105, 115, 149.

▮ Additionally, contrary to defendants Shapiro, Payless, Niederman, Kesef Properties, and the Malik Defendants' assertion, Shapiro Mem. at 14–15; Shapiro Reply at 15, "New York law does not require an unjust enrichment plaintiff to plead 'direct dealing,' or an 'actual, substantive relationship' with the defendant. It merely requires that the plaintiff's relationship with a defendant not be 'too attenuated.'" *Waldman v. New Chapter, Inc.*, 714 F.Supp.2d 398, 403 (E.D.N.Y.2010) (quoting *Sperry v. Crompton Corp.*, 8 N.Y.3d 204, 215–216, 831 N.Y.S.2d 760, 863 N.E.2d 1012 (2007)). Here, Amusement alleges that these defendants have in their possession a portion of the specific funds it placed into escrow. While Amusement does not allege that the funds were transferred directly from it to these defendants, it does allege the specifics of the transfers by which defendants came into possession of the funds. Amusement additionally alleges that the defendants were aware, based on their existing relationship with Mark Stern, that "they had no legitimate right to the funds," and that "by accepting such funds they were participating in and furthering a money-laundering scheme." Compl. ¶ 149; *see id.* ¶¶ 59, 65, 68–69.

Because Amusement alleges that the defendants knew that they were receiving Amusement's escrow funds illegitimately, this is not a case in which "the parties are simply to far removed from one another for an unjust enrichment claim to stand," Shapiro Reply at 16. *See Eastman Kodak Co. v. Camarata*, 2006 WL 3538944, at *15 (W.D.N.Y. Dec. 6, 2006) (parties relationship not to "attenuated" for unjust enrichment claim where "plaintiffs allege that [defendant] knowingly furthered the scheme to defraud by means of money laundering, and that in so doing [defendant] was enriched through her receipt of substantial sums of money") (internal quotation marks and citation omitted); *cf. Redtail Leasing, Inc. v. Bellezza*, 1997 WL 603496, at *8 (S.D.N.Y. Sept. 30, 1997) ("contemporaneous trading relationship" too attenuated to establish unjust enrichment claim).

Finally, Stephen Stern and the Mark Stern Defendants' assertion that Amusement authorized the release of the $13 million from escrow, *see* Stern Mem. at 42–43; Midland Mem. at 34–35, is not alleged in the complaint, and thus is not considered on this motion to dismiss. *See Iqbal*, 129 S.Ct. at 1949–50. Additionally, Stephen Stern's argument that the payment to him consisted of the payment of legal fees does not alter the fact that it is al-

leged that he was aware that Amusement's money could not be used for this purpose. *See* Compl. ¶ 56.

### K. *Aiding and Abetting Fraud (Count 8 ¶¶ 155–69)*

 Stephen Stern argues that Amusement has failed to state a claim against him for aiding and abetting fraud. *See* Stern Mem. at 43–57; Stern Reply at 26–33. To establish liability for aiding and abetting fraud, the plaintiffs must show "(1) the existence of a fraud; (2) [the] defendant's knowledge of the fraud; and (3) that the defendant provided substantial assistance to advance the fraud's commission." *Lerner*, 459 F.3d at 292. To show the first element—the existence of a fraud—a plaintiff must show "(1) defendant made a representation as to a material fact; (2) such representation was false; (3) defendant intended to deceive plaintiff; (4) plaintiff believed and justifiably relied upon the statement and was induced by it to engage in a certain course of conduct; and (5) as a result of such reliance plaintiff sustained pecuniary loss." *Ross v. Louise Wise Servs.*, 8 N.Y.3d 478, 488, 836 N.Y.S.2d 509, 868 N.E.2d 189 (2007) (internal punctuation, quotation marks, and citation omitted). Additionally, as already discussed, Fed.R.Civ.P. 9(b) requires that fraud be pled with particularity. "[I]n order to comply with Rule 9(b), 'the complaint must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *Lerner*, 459 F.3d at 290 (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir.1993)). While "the fraud alleged must be stated with particularity[,] ... the requisite intent of the alleged [perpetrator] of the fraud need not be alleged with great specificity." *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 267 (2d Cir. 1996) (citations omitted); *see also* Fed.

R.Civ.P. 9(b) ("Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."). Nonetheless, a plaintiff " 'must allege facts that give rise to a strong inference of fraudulent intent.' " *Lerner*, 459 F.3d at 290 (quoting *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 52 (2d Cir.1995)).

 We first ask whether the complaint alleges the existence of a primary violation—that is, the fraud that Stephen Stern is alleged to have aided and abetted—and whether the allegations regarding this primary fraud comply with Rule 9(b). The answer to this question is not easily given, however, because the complaint is unclear as to what primary fraud Stephen Stern is alleged to have aided and abetted. In the portion of the complaint devoted to the aiding and abetting fraud count, the complaint states that Mark Stern and the Stern entities made "statements and omissions designed to induce Amusement to leave its $13 million in escrow with Frenkel and, after the money was misappropriated, to cause Amusement to believe that its money was still in escrow or being properly used for the Portfolio." Compl. ¶ 156; *see* # 21 Opp. at 35. These "statements and omissions" are not specifically identified, however. In a later paragraph, the complaint asserts that the false statements "includ[e], but [are] not limited to[,] Mark Stern's false statement of his: financial statement, litigation history, closing expenses (including an overstatement of Stephen Stern's own fee) and ability to provide an ownership interest in the properties to Amusement." Compl. ¶ 167. But this paragraph too does not identify with particularity any false statements that are alleged to constitute the primary fraud that Stephen Stern aided and abetted. Thus, the Rule 9(b) specificity requirement has not been met.

For what it is worth, Amusement's brief in opposition to Stephen Stern's motion

identifies the statements underlying the primary violation as including the allegations that Mark Stern "created false invoices and expenses" and "distributed Amusement's money to his family, friends, and associates." # 21 Opp. at 35. No other statements are identified, however, and it is unclear how either category allows this claim to proceed. The latter category could not amount to a false statement as the "distribut[ion]" of funds does not constitute a "representation as to a material fact." As to the first category, the plaintiff's memorandum of law references only "¶ 47 *et seq.*" of the complaint. *See id.* Through this citation, we assume that the statements intended to be referenced are the expenses that Mark Stern placed into the closing statements of the Colonial transaction, *see* Compl. ¶ 48.

But even if we were to assume, *arguendo,* that the description of these expenses meets the requirements of Rule 9(b), what is still lacking is an allegation that Amusement justifiably relied upon these statements or that these statements induced it to leave its $13 million in escrow. *See Ross,* 8 N.Y.3d at 488, 836 N.Y.S.2d 509, 868 N.E.2d 189 (reliance required to show fraud); *see also Amusement Indus., Inc. v. Stern,* 693 F.Supp.2d 327, 350 (S.D.N.Y. 2010) ("The reliance requirement means that it is insufficient for a fraud plaintiff to show merely that some chain of events beginning with a false statement by defendants led to his injury.") (internal quotation marks and citation omitted). While Amusement states that Mark Stern created and submitted the false expenses "so that there would appear to be higher than actual expenses associated with the purchase of the Portfolio," Compl. ¶ 47, and that the expenses "were designed with the specific intent to improperly separate

Amusement from its funds," *id.* ¶ 98, Amusement does not allege that it actually believed or relied on these allegedly false expenses for any purpose or that it was actually induced by these expenses to leave its $13 million in escrow, *see* # 21 Opp. at 34–41. *See Schuh v. Druckman & Sinel, L.L.P.,* 2008 WL 542504, at *10 (S.D.N.Y. Feb. 29, 2008) (granting motion to dismiss where "the complaint d[id] not allege any facts [to] suggest ... that the plaintiffs actually 'believed and justifiably relied' on any statements made by the defendants with respect to the amounts required to pay off their mortgage or on any other statements alleged by plaintiffs to have been false").

Because Amusement has not sufficiently alleged the existence of a primary fraud, Amusement's claim against Stephen Stern for aiding and abetting fraud must fail.

### L. *Personal Wrongdoing by Shapiro and Niederman*

Shapiro and Niederman argue that the claims against them must be dismissed because Amusement did not allege either personal wrongdoing by them or facts enabling Amusement to pierce the corporate veil. *See* Shapiro Mem. at 9–13.

Amusement alleges that Shapiro is an officer and shareholder of Payless. Compl. ¶ 12. Niederman is alleged to be an officer and shareholder of Kesef Properties and/or Benjamin Irwin. *Id.* ¶ 14. Amusement does not allege that either Shapiro or Niederman personally received any funds belonging to Amusement. Instead, it has alleged only that funds transferred to corporate accounts of the entities controlled by these two defendants were "for [their] benefit," *see* Compl. ¶¶ 64, 66—presumably, the benefit that any owner of a corporation receives.[8] Amusement has

---

8. The broad allegation in paragraph 7 of the complaint that funds were "diverted to" each of the defendants, including Niederman and Shapiro, is insufficient to show that the funds

also alleged, however, that Niederman and Shapiro "exercised complete and actual dominion" over the entities they controlled and that "such domination was used to commit a fraud or wrong that injured Plaintiff." Compl. ¶¶ 23–25. These are the only allegations in the complaint that bear on piercing the corporate veil, and they are insufficient inasmuch as they are merely legal conclusions. *See, e.g., Apex Maritime Co., Inc. v. OHM Enterprises, Inc.,* 2011 WL 1226377, at *4 (S.D.N.Y. March 31, 2011) (dismissal granted because allegation that individual defendants "exercise[d] complete dominion and control" over corporation was "conclusory" and therefore insufficient to pierce corporate veil). There are no factual allegations that "actively and plausibly suggest" how the exercise of dominion took place. Thus, the allegations fail under the *Iqbal* standard.

As a result, the fraudulent conveyance claims, which can only be brought against transferees or beneficiaries of a fraudulent conveyance, cannot proceed against these defendants because the complaint alleges that the funds were received by corporations they controlled. Nor can these defendants be liable for the conversion of any monies or for unjust enrichment as they are not alleged to have personally received any funds. As to the remaining claim for aiding and abetting conversion, there are no allegations that describe Shapiro and Niederman's specific actions and thus there is no basis on which to conclude that they are responsible for any acts done by the corporate entities they allegedly controlled.

Accordingly, all claims against Shapiro and Niederman should be dismissed.

## IV. *CONCLUSION*

For the foregoing reasons, Stephen Stern's motion to dismiss (Docket # 21),

the Mark Stern Defendants' motion to dismiss (Docket # 32), and Joshua Shapiro, Payless, Joseph Niederman, Kesef Properties, and the Malik Defendants' motion to dismiss (Docket # 49) should be granted in part and denied in part.

Specifically, the following claims against Stephen Stern should be dismissed: the claim for constructive fraudulent conveyance (Count 1), the claim for aiding and abetting fraudulent conveyance (Count 3), and the claim for aiding and abetting fraud (Count 8). The claim against all of the defendants for aiding and abetting fraudulent conveyance with intent to defraud (Count 4) should be dismissed in its entirety. All claims against Shapiro and Niederman should be dismissed.

Thus, the following claims remain: the claim for constructive fraudulent conveyance (Count 1) against all defendants except Stephen Stern, Shapiro and Niederman; the claim for intentional fraudulent conveyance (Count 2) against all defendants except Shapiro and Niederman; the claim for conversion (Count 5) against all defendants except Shapiro and Niederman; the claim for aiding and abetting conversion (Count 6) against all defendants except Shapiro and Niederman; the claim for unjust enrichment (Count 7) against all defendants except Shapiro and Niederman.

## PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have fourteen (14) days including weekends and holidays from service of this Report and Recommendation to serve and file any objections. *See also* Fed.R.Civ.P. 6(a), (b), (d). Such objections (and any responses to objec-

were given to them personally as opposed to the corporations they controlled.

tions) shall be filed with the Clerk of the Court, with copies sent to the Hon. Lewis A. Kaplan, and to the undersigned, at 500 Pearl Street, New York, New York 10007. Any request for an extension of time to file objections must be directed to Judge Kaplan. If a party fails to file timely objections, that party will not be permitted to raise any objections to this Report and Recommendation on appeal. *See Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C.,* 596 F.3d 84, 92 (2d Cir.2010).

Dated: August 5, 2011

New York, New York